Willie Roy JENKINS, Appellant

v.

The STATE of Texas

NO. AP–77,022

Court of Criminal Appeals of Texas.

Delivered: June 29, 2016

Kerri K. Anderson–Donica, Corsicana, Angela Moore, San Antonio, for appellant.

Katherine D. Hayes, Assistant District Attorney, Lisa C. McMinn, State's Attorney, Austin, for the State.

## OPINION

Richardson, J., delivered the opinion of the Court in which Keller, P.J., Meyers, Johnson, Keasler, Hervey, and Yeary, JJ., joined.

In June 2013, a jury convicted appellant of capital murder for committing the offense of murder in the course of aggravat-

ed rape in November 1975.[1] Based upon the jury's answers to the special issues set forth in Texas Code of Criminal Procedure Article 37.0711, sections 3(b) and 3(e), the trial judge sentenced appellant to death.[2] Direct appeal to this Court is automatic.[3] Appellant raises nineteen points of error. After reviewing appellant's points of error, this Court finds them to be without merit. Consequently, we affirm the trial court's judgment.

## STATEMENT OF FACTS

The trial record reflects that the victim, Sheryl Norris, moved to San Marcos, Texas, from Florida in late August or early September of 1975. Her boyfriend, Charles Wayne Andrus, had moved to San Marcos earlier in the summer to attend Southwest Texas State University. Their mutual friend, Joe Sewell, shared an apartment with Andrus during the summer, but after Norris arrived, Sewell moved out, and Norris moved into the apartment. Norris found employment as a secretary at the Crime Prevention Institute, which was part of Southwest Texas State University's Department of Law Enforcement.

On November 24, 1975, the Monday before Thanksgiving, Norris arrived at work around 8:00 a.m. She planned to travel to Florida later that week to spend Thanksgiving with her family. She requested and received permission from her supervisor, Fred Stansbury, to take the afternoon off to pack for her trip. The office routinely closed at noon, and the employees would leave the premises until the office reopened at 1:00 p.m. At noon, Norris went home for lunch, as she did on most days. Andrus, who was studying on campus, telephoned Norris at their apartment two times between noon and 1:00 p.m. because he and Norris usually talked over the phone during Norris' lunch break, but no one answered.

When Norris did not return to work in the afternoon, Stansbury assumed that she had stayed home to pack for her trip. Andrus returned home around 5:05 p.m. to find the front door ajar and the music on the stereo turned up to an "almost deafening level." As he entered the apartment, he noticed that a throw rug by the front door was crumpled. He turned down the stereo and walked through the apartment, calling for Norris. He saw her when he turned on the bathroom light. At first he thought she had fallen, and he grabbed her arm to help her. He felt that her arm was stiff and cold, and then he saw that her pants were down. He believed that she was dead. Afraid that Norris' killer was still in the apartment, Andrus ran to a neighbor's apartment and telephoned the police.

Around 6:00 p.m., Norris' supervisor Stansbury received a call at home from the San Marcos Police Department, requesting that he identify one of his employees in a homicide they were investigating. When he arrived at Norris' apartment, police investigators and a Texas Ranger were already inside. He identified Norris' body and then answered the Ranger's questions about Norris' schedule and plans for that day.

The Texas Department of Public Safety ("DPS") assisted with the investigation. Three specialists from the DPS lab in Austin—a serology trace evidence analyst, a fingerprint examiner, and a photogra-

---

1. Tex. Penal Code Ann. § 19.03(a)(2) (Vernon 1975).

2. Art. 37.0711, § 3(g).

Unless otherwise indicated, all references to Articles refer to the Code of Criminal Procedure.

3. Art. 37.0711, § 3(j).

pher—arrived at Norris' apartment around 8:00 p.m. Ron Urbanovsky, the serology trace evidence analyst, observed that the apartment was generally tidy, but the throw rug by the front door was crumpled. He saw coins scattered on the floor near the front door and elsewhere in the apartment, and a folded dollar bill on the floor near the foot of the bed in the master bedroom. Urbanovsky believed that the placement of these items could indicate that a struggle had occurred. In the master bedroom, Urbanovsky observed fecal material on a green blanket on the bed. He also saw feces on the side of the bed and on the floor leading from the bed to the adjoining bathroom. He noted that the bed was a "strange place to find fecal material," and that it suggested that "somebody was losing control." There was a dent in the sheet rock next to a light switch. Urbanovsky later determined that the damaged sheet rock material was consistent with white powdered material on the toe of one of Norris' boots, which suggested that Norris had kicked the wall during a struggle.

Urbanovsky observed blood on the bathroom door and the doorjamb. Inside the bathroom, Norris' body was "bent over backward." Her head and shoulders were under water in the bathtub, and her back was arched over the side of the bathtub. Her arms were bent at the elbow so that her wrists and hands were in the water. The rest of her body was outside of the bathtub, with her buttocks and feet propped on the floor.

Norris was wearing a wristwatch, which was submerged. It had stopped at 12:31. The water was almost to the top of the bathtub and it was discolored. Two scarves or ties were knotted tightly around Norris' neck. Norris was wearing knee-high boots and a long-sleeved white blouse.

Her trousers had been pushed down around one of her boots.

As responders lifted Norris' body onto a gurney, Urbanovsky observed "a lot of blood" and fecal material in the area of Norris' genitals and buttocks. There was also fecal material on the bathroom floor underneath Norris' body. Based on his observations, Urbanovsky "thought [they] were looking at a rape/murder."

Norris' body was transported to a local funeral home. Dr. Charles Bell conducted an autopsy that night, with Urbanovsky and the DPS photographer in attendance. In the area where the ligatures were tied around Norris' neck, Bell and Urbanovsky observed abrasions that suggested strangulation. Bell noted the presence of water in Norris' lungs. He collected blood, fingernail clippings, and hair samples from Norris' body. He swabbed Norris' vagina and smeared the vaginal sample onto a slide, which he viewed under a microscope. Bell identified intact spermatozoa in the vaginal sample and placed the slide into a glass jar, which he gave to Urbanovsky. After the autopsy, Urbanovsky and the other DPS specialists drove to the DPS lab in Austin, where they logged and stored the materials they had collected. Urbanovsky placed the jar containing the slide into the freezer.

Urbanovsky later viewed the slide through a microscope and confirmed the presence of spermatozoa. He created a second slide from the vaginal sample so that he could analyze the material while preserving most of the original sample. Urbanovsky analyzed a small part of the sample to obtain an ABO blood grouping of potential contributors. He also obtained Norris', Andrus', and Sewell's ABO blood groupings and compared them to the ABO blood grouping he obtained from the sample.

Urbanovsky testified at trial that: Norris had type B blood and was a secreter, meaning that her blood group substances included B and H; Andrus had type O blood and was a secreter, meaning his blood group substances included O and H; and Sewell had type A blood and was a secreter, meaning his blood group substances included A and H. The ABO blood grouping obtained from the vaginal sample included blood group substances B and H. This result included Norris as a contributor and excluded Sewell. Urbanovsky noted that his conclusion concerning Andrus was less certain; if a contributor to the sample had been a secreter with type O blood (like Andrus), the analysis would not detect the blood group substance O, but one would still expect it to detect the H. Further, the ABO blood grouping analysis would not detect the blood group substances of a non-secreter, and therefore Urbanovsky could not draw any conclusions concerning the possibility of an unknown contributor who was a non-secreter.

Urbanovsky also used a microscope to examine a hair fragment found under Norris' fingernails. He determined that the hair fragment did not belong to Norris, Andrus, or Sewell. He also examined hairs that he had collected from the crime scene. Some were consistent with Andrus and Sewell, but since both men had lived in the apartment, Urbanovsky could not draw any conclusions from this finding. These results were all that Urbanovsky could obtain from available forensic testing in 1975.

Law enforcement officers investigated several potential suspects, but by the late 1970s, the case was inactive.[4] In April 1996, Norris' sister, Terry Ehart, called the San Marcos Police Department to inquire about the status of the case. Her call prompted police investigators to re-examine the file. After reviewing the case file with other investigators, Sergeant Penny Dunn consulted Javier Flores, a DNA analyst at the DPS lab in Austin, about conducting DNA analysis on some of the materials that had been collected in 1975.[5] Flores conducted the analysis. He took two swabs from the original vaginal smear and froze them. He preserved one swab, which was still in the lab's freezer at the time of the trial. He extracted a liquid from the second swab for further testing. Flores and later DNA analysts used this liquid extract in their analyses of the vaginal sample. Flores analyzed a small part of the extract in 1997, using PCR technology.[6] With the results of this DNA analy-

4. Through trial testimony, the State developed the fact that Norris' boyfriend Andrus was a marijuana dealer. Andrus testified that Norris was unaware of his drug dealing and that he tried to keep her from being involved. Andrus was very cooperative with police after the murder and provided the names of his marijuana contacts out of concern that his drug activity had lead to Norris' murder. However, none of the marijuana contacts became viable suspects. Andrus continued to assist law enforcement with their investigation over the thirty years the case remained cold. When appellant was targeted as a suspect, Andrus was contacted for possible connection to his past drug-dealing, but Andrus did not recognize appellant in a photograph that police showed him and he was unable to identify appellant as someone who had been around the apartment or within his circle of marijuana contacts.

5. Flores explained at trial that "DNA" is an abbreviation for deoxyribonucleic acid, which is "kind of like the central blueprint of all of the body's activities and also maintains and preserves and passes on the genetic information to the offspring or to the replicated cells."

6. Flores testified that "PCR" stands for "Polymerase Chain Reaction." The specific type of PCR test that Flores "ran" on this extract was a DQ–Alpha "kit," which provided information about a specific location on the DNA strand.

sis, Flores was able to exclude Andrus as a contributor, but he was not able to obtain a DNA profile that was sufficient to help identify other potential contributors.

In 1999, Cassie Carradine, another DNA analyst at the DPS lab, conducted STR testing on a portion of the extract and obtained a partial DNA profile.[7] This profile provided more information than the 1997 analysis, but it was not sufficient to upload into the CODIS database.[8] However, by comparing the partial DNA profile to individual known DNA profiles, investigators excluded as contributors Andrus and several other potential suspects.

In 2010, the DPS lab acquired the ability to "run," or analyze by using, the "Minifiler," a more sensitive and discriminating DNA profiling technique that was suitable for analyzing small and degraded biological samples. Analyst Negin Kuhlmann ran a portion of the liquid extract through the Minifiler and obtained a full DNA profile. DPS uploaded this profile into CODIS. Approximately a month later, DPS obtained a "hit," or match with an existing profile, from CODIS and identified appellant, who was then in California. This identification marked the first appearance of appellant's name during the investigation of the case. When Dunn showed Andrus a picture of appellant, Andrus stated that he had never seen that person before.

Sergeant Dunn traveled to California and obtained a buccal swab from appellant, which submitted to the DPS lab.[9]

Kuhlmann analyzed this buccal swab to create a known DNA profile from appellant that could be compared with the DNA profile she had obtained from the extract. Kuhlmann compared the profiles and determined that appellant was included as a contributor to the profile she had obtained from the liquid extract. She prepared a report in which she noted that "the probability of selecting an unrelated person at random" who could be a contributor to the DNA profile obtained from the vaginal sample was approximately 1 in 365.6 quadrillion for Caucasians; 1 in 5.705 quadrillion for Blacks; and 1 in 20.37 quintillion for Hispanics. Kuhlmann testified that, at the time she wrote her report, the population of the world was about 6.8 billion.

While searching for other evidence that might be appropriate for DNA analysis, Dunn discovered a yellowed hand print on Norris' white blouse. Kuhlmann made an extract from a cutting on the blouse and was able to obtain a full DNA profile, which she compared with appellant's known DNA profile. Appellant could not be excluded as a contributor to the profile obtained from the blouse. Kuhlmann noted in her report that the probability of selecting an unrelated person at random who could be a contributor to the DNA profile obtained from this extract was approximately 1 in 457.9 trillion for Caucasians; 1 in 44.68 trillion for Blacks; and 1 in 8.977 quadrillion for Hispanics.

Dunn investigated appellant's background and discovered that he had grown

---

7. Flores and Carradine explained that "STR," which stands for "Short Tandem Repeat," is a more discriminating and sensitive type of PCR testing than previous techniques.

8. During a hearing prior to the DNA analysts' testimony, the prosecutor stated that she had instructed the witnesses that they were not to reveal to the jury that the CODIS database contains the DNA profiles of criminal offenders. The record reveals that, although the

jury did not hear this information at the guilt phase, appellant's DNA profile was in CODIS due to previous convictions for sexual assault in Texas and California. Carradine testified before the jury that "CODIS" is an acronym for "Combined DNA Index System."

9. The buccal swab sample was collected from appellant pursuant to a valid search warrant. Appellant raises no issue with regards to the legality of the collection of the buccal swab.

up in Marion, Texas, which is about an hour's drive from San Marcos. After appellant graduated from high school in Marion, he attended Southwest Texas State University for one semester before he joined the United States Marine Corps. Appellant served in the Marines from 1973 to 1976. In 1975, he was stationed at a military base in California. From November 23, 1975, to December 5, 1975, appellant was on emergency leave while his wife was hospitalized in San Antonio, Texas. During this two-week period, appellant stayed at his father-in-law's house in Marion.

By the time of the trial, Dr. Bell, who had performed Norris' autopsy, was deceased. Therefore, Dr. Jeffrey Barnard testified about the autopsy results. Based on his review of the autopsy report, crime scene photos, and autopsy photos, Barnard opined that Norris died from homicide by strangulation and drowning. He noted that the ligatures around Norris' neck, together with the abrasions and hemorrhages in that area, were consistent with strangulation. "Punctuate hemorrhages" or petechia on the lower back of Norris' head and the suffusion of blood vessels in Norris' face were consistent with compression of the blood supply. Barnard testified that strangulation by impeding blood flow would take several minutes. If arterial blood flow to the brain were continuously impeded, it would take 10 to 15 seconds for the victim to lose consciousness. After that, the blood flow would have to be shut off continuously for a few more minutes before death would result. Barnard stated that bubbles around Norris' mouth and nose, visible in both the crime scene and autopsy photos, were indicative of drowning. Drowning would take several minutes of continual submersion.

Barnard testified that he observed some skin slippage and signs of decomposition that indicated that Norris' body had been submerged in warm water for at least four and one-half hours before it was photographed at the crime scene. Barnard observed "some hemorrhage as well as some feces visible" in the vaginal and anal areas. He stated that this evidence, as well as the state of undress and the positioning of Norris' body, were consistent with sexual assault. Barnard opined that, in light of everything he had seen, this was a strangulation attendant to a sexual assault: "The fact that she's in the bathtub and part of her clothes are off and she's had, in my opinion, strangulation, those all go together."

## PUNISHMENT EVIDENCE

Testimony at the guilt/innocence stage of trial established that appellant deliberately caused the death of Sheryl Norris by continuously submerging her in water for several minutes and that appellant did so with the expectation that Norris would drown.[10] Most of the punishment stage of trial focused on "whether there [was] a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society:"[11] The State called victims of appellant's past sexual assaults, appellant's stepdaughters whom he sexually molested, and fellow inmates from penal and psychiatric institutions who had been brutalized by appellant while he was in custody.

10. Before rendering a verdict of death a jury must answer in the affirmative "whether the conduct of the defendant that caused the death of the deceased was committed deliberately and with the reasonable expectation that the death of the deceased or another would result." Art. 37.0711(b)(1).

11. Art. 37.0711(b)(2)

*Rape victims*

The State called witnesses to testify to five different rapes committed by appellant. One rape victim testified that appellant raped her in California on August 8, 1975—a mere three months before raping and killing Norris. The victim described riding her bicycle near Joshua Tree National Park when appellant pulled her from her bicycle and dragged her into his car. Appellant drove off with the victim on the floorboard of his car. The victim testified that she saw a pencil in the floorboard and considered stabbing appellant, but decided against it because she feared appellant would kill her. After driving a distance from where he abducted her, appellant stopped the car and raped the victim. Then appellant drove back to the scene of the abduction, where police had already gathered because a friend of the victim recognized her abandoned bicycle and suspected foul play, and appellant "stopped about 50 or 60 feet in front of all these police officers and just pushed [her] out of the car and then he rode right through them." Appellant pled guilty to rape in San Bernardino County, California and was originally given a probated sentence of three years. Appellant's probation was later revoked.

Another victim was raped twice by appellant in San Antonio, Texas, in early 1977. The victim testified that the experiences were so traumatizing that she had difficulty remembering the details of the rapes. The victim told of one of the rapes occurring at a used furniture store where she worked after graduating from high school. After raping the victim, appellant left the store and drove off, but not before the victim was able to run out of the store and see the license plate number on appellant's car. Despite having appellant's license plate number, the victim did not report the rape to police at that time. The victim then told of a second rape that occurred at the same store. Her memory was not clear, but she did then report both sexual assaults to the police. The victim was asked by police to identify her rapist from a live line-up, and she identified appellant. The victim did not testify in court against appellant at that time and testified that she has tried to block the rapes from her mind.

Appellant's next victim was sexually assaulted in May 1977, when she was in her early twenties. The victim died before this trial. Barbara Niemann and Eddie Pinchback, both with the San Antonio Police Department, testified to their investigation of the rape. Niemann interviewed the victim and said that the victim identified her assailant from a line-up. Pinchback testified that appellant was eventually arrested for the rape. Pinchback also testified that he interviewed a witness by the name of Willie Wood in connection with the rape. Willie Wood testified that he was the person the victim initially encountered after she was raped and that he and some of his coworkers were the ones who called the police. Wood testified that the victim came running into the grocery store warehouse in San Antonio, where he worked the 11 p.m. to 7 a.m. shift, and that the victim was naked from the waist down and crying hysterically. Wood testified that the victim had cuts and bruises all over her head. Appellant pled guilty to aggravated rape in this case. On November 14, 1977, he was convicted in Bexar County and sentenced to seven years' imprisonment.

Another victim, C.P.V., testified that appellant raped her on August 20, 1983, in California when she was trying to get a ride back home to another town. C.P.V. testified that she initially felt safe about taking a ride from appellant because there was an older man in the backseat of the

car and she had not had problems when she had previously accepted rides. However, after dropping the older man off at a bus station, appellant drove to a secluded spot and raped C.P.V. in the car. Appellant pled guilty to "rape by force" in Kern County, California on October 14, 1983. He was sentenced to eight years' of imprisonment.

The last rape victim to testify against appellant testified that appellant raped her on June 16, 1991, when she was twenty-one years old. The victim had gone to a laundromat in the early morning hours of June 16, but upon discovering that she needed coins for the laundromat, the victim began walking to a gas station. Appellant drove by and offered the victim a ride. Once the victim was in the car, appellant drove to a dark road and raped her in his car. After the rape, appellant allowed the victim to leave the car. The victim walked back to the laundromat to get her clothes and went home without reporting the rape because she was so embarrassed. However, she eventually reported the rape to police and picked appellant out of a line-up. Appellant pled guilty to "rape by force" in Kern County, California. He was convicted and sentenced to eight years' imprisonment, enhanced to ten years for two prior rape convictions.

*Molestation of Stepdaughters*

The State also called appellant's two stepdaughters to testify about appellant's sexual molestation of them when they were children. Although no charges were ever brought against appellant by the stepdaughters or their mother on her daughters' behalf, the State asked the stepdaughters to testify and appellant's counsel had opportunity to cross-examine them about the sexual abuse. Appellant was seventeen years old when he began dating an older woman who had four children from a previous marriage. Appellant eventually married this woman, and the two boys and two girls became his stepchildren.

Even before marrying their mother, appellant began sexually molesting the youngest daughter whom he would babysit while her mother worked the night shift at the Seguin Police Department as a dispatcher. The youngest daughter told her mother that appellant was touching her inappropriately, but her mother did not believe her. Appellant joined the Marines, and was first stationed in California, followed by North Carolina. Appellant and his wife left her three oldest children in foster care in Texas but took the youngest daughter, who was around ten years old at that time, to live with them. The youngest daughter testified that while she lived with her mother and appellant in North Carolina, appellant repeatedly tried to sexually assault her. At first, appellant's wife tried to protect her daughter from appellant's sexual abuse; she went as far as barricading her daughter in her bedroom before appellant got home from work so that appellant could not enter the room. But after her daughter ran away from home to get away from appellant, appellant's wife sent her daughter back to San Antonio alone. In San Antonio, the youngest daughter was put in foster care, but when appellant and his wife returned to Texas, the youngest daughter, thirteen at the time, ended up living with them. Appellant began sexually assaulting her again. This time appellant's wife told her daughter to let appellant have sex with her: "My mother approached me and said that if I would let Willie Roy sleep with me, that he would leave me alone." However, appellant did not leave her alone. She was put back into foster care at age fifteen and eventually moved in with her biological father. Appellant's stepdaughter did not return to her mother's custody

after that and had no contact with appellant since that time.

The oldest of appellant's stepdaughters testified that appellant would come into her bed at night and fondle her as well as spy on her when she was undressed in the bathroom. The oldest stepdaughter was able to escape continued sexual abuse by appellant because appellant and her mother left the three oldest children in Texas when they moved to California.

*Assaultive Behavior in Custody*

The State sufficiently established appellant as a sexual predator when outside of penal institutions, but the State also provided ample evidence that appellant would be a future threat even when confined within institutions. The State played for the jury nineteen video depositions of patients and staff who had interacted with appellant while he was confined to Atascadero State Hospital and Coalinga State Hospital in California for treatment as a sexually violent predator.[12] Appellant had a reputation for attacking both patients and staff while confined in the California state hospitals.[13]

The patients from Atascadero and Coalinga who had previously been on the same ward as appellant related general opinions of appellant being difficult to get along with and incidents of appellant starting fights over what program the patients would watch in the communal television room. One patient, who was 6'1", 225 pounds, and very physically fit, recounted how appellant disagreed with him about which sports program would be shown on the group's television, and then later he and appellant got into a physical fight which resulted in appellant giving him a bloody nose. Another patient related how he was bullied by appellant over the television programs and how he was bitten by appellant when they got into a fight about the television. Appellant assaulted a disabled patient who used a walker to assist him in walking. This patient testified that appellant tried to gouge his eyes out, but the patient refused to press charges because he was afraid of appellant.[14] Other patients who were assaulted by appellant also refused to press charges because they were afraid of appellant. Several staff members testified to the assaults committed by appellant, and they described appellant as the aggressor and unusually prone to biting others when fighting.[15]

12. The "Sexually Violent Predator" classification is a legal status determined by the court. It is also a qualifying requisite in order to be admitted to the Coalinga State Hospital. After multiple convictions for sexual assault in California, appellant was classified by the State of California as a "sexually violent predator" and was ordered to be confined in a California state hospital for treatment.

13. Based on the opinion of one of appellant's treating psychologists and the judgment of a veteran detective who had served at the state hospital since its inception, there was unqualified agreement that appellant was one of the most dangerous individuals at the Coalinga State Hospital. Furthermore, both of these professionals agreed that appellant would have qualified for Unit 9 confinement—a unit under "total lock-down" reserved for only the most violent and uncontrollable patients at

the hospital—had appellant remained at Coalinga and not been remanded to Texas for this charge.

14. His entire treatment team, led by his treating psychologists, agreed that although there was no medical justification to continue to house appellant in a single room living quarters, appellant was too dangerous to be moved to a dormitory setting in light of his frequent threatening verbal statements and acts.

15. According to the deposition testimony of multiple police officers at the hospital (California State Hospitals have their own police department which provides law enforcement services to California's system of state hospitals, including Atascadero and Coalinga State Hospitals), incidents of biting were rare even

One former patient of Coalinga State Hospital, who now lives in Texas, testified at appellant's trial. This former patient, who had previously served time in California's Folsom and San Quentin prisons, related how appellant gave him the worst beating of his life because he got into an argument with appellant about which Los Angeles neighborhood the L.A. Lakers Staples Center was located in. The former patient said appellant knocked out three of his teeth and gouged his eyes during the fight, causing him to be sent to the infirmary and then an outside medical facility for ten days.

The staff from Atascadero and Coalinga testified that appellant was defiant towards staff and had a nothing-to-lose attitude toward anyone who tried to discipline him.[16] Staff witnessed numerous confrontations and physical fights between appellant and other patients. Appellant was also known to assault staff members.[17] One female psychiatric technician recalled how appellant pulled her hair and scratched her neck when grabbing her by her hospital identification lanyard hanging around her neck. This technician said that appellant shouted profanities at her and told her he wished she would die.

## Mitigation

The defense focused on, "Whether, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed."[18] The defense presented testimony of family members and friends of the family to illustrate the promise of a young man who had at one time played football for what is now Texas State University on a full-ride athletic scholarship and the difficult circumstances of poverty and abuse from which appellant had risen. Although it was generally agreed that appellant grew up in poverty, the State effectively cross-examined appellant's childhood friends to establish that they were not familiar with appellant's home life and that they had not

though altercations were not uncommon. Appellant's biting was remarkable to the deposed officers not only for its frequency but also for its depth. In multiple incidents, appellant bit through the clothing of another victim to leave bleeding wounds. Additionally, appellant often continued these kinds of physical attacks well after his opponent was already subdued. In one instance, police officers resorted to physical force while trying to separate appellant from another patient because appellant was both biting the patient's leg and trying to rip the patient's testicles off with his hand.

16. Appellant was clinically diagnosed with (1) paraphilia—based on his deviancy for sexual contact with non-consenting persons, (2) alcohol abuse/dependance, and (3) adult anti-social personality disorder. However, none of these diagnoses qualified as a *mental* disorder for purposes of special civil commitment under California state law. Appellant adamantly refused to accept treatment by the California state hospitals for any of these problems. Appellant propositioned his treating psychiatrist and another staff member for a "threesome" in one episode of aggressive behavior. As a result of this kind of behavior, the psychiatrist ordered an increased daily searches of appellant's living quarters, as part of an effort to curb his behavior, but appellant maintained his refusal to accept any treatment.

17. Multiple Coalinga State Hospital police officers and staff believed appellant to be an individual capable of violence in spite of the hospital's secure setting. Deposition testimony revealed that appellant's reputation for verbal and physical aggression was such that it was common for staff members to call police when they needed to confront appellant for his failure to comply with hospital rules.

18. Art. 37.0711(e)

maintained contact with appellant since childhood. The State also cross-examined family members to establish that the physical abuse between adults in the various households in which appellant lived was not witnessed by appellant and occurred at times when appellant was not living in the home. The defense also presented testimony in the form of video depositions from eight patients and one guard who had known appellant from his time in California state hospitals for sexually violent predators. These eight patients and the one guard testified in their depositions that they knew appellant mostly kept to himself, but they did not know him to be violent or one to start altercations.[19]

In rebuttal the State presented witnesses who had been housed with appellant in Hays County Jail while appellant awaited this trial. One of these inmates, who was twenty-six years old, 6'2", and 235 pounds, testified that he and other inmates requested that appellant, who is sixty years old, be removed from their cell block because he was dangerous. Another of these inmates recounted that it had taken four to five officers to remove appellant from the cell block when the request for removal was granted. A Hays County Sheriff's Department sergeant testified that the Sheriff's Department had tried to avoid problems between appellant and other inmates by moving appellant around to different cell blocks in the jail—at one point moving him to a cell with one inmate who had committed a similar offense to appellant and another inmate who had been convicted of murder on behalf of the Mexican Mafia crime syndicate. But even inmates with convictions for equally or more violent offenses requested that appellant be moved for fear of their own safety.

## SUFFICIENCY OF THE EVIDENCE

▇ In point of error one, appellant asserts, "The death sentence must be reformed to life imprisonment because the evidence is insufficient to establish that appellant deliberately caused the death of Sheryl Ann Norris." However, appellant has not briefed this point of error, which concerns the punishment phase. Instead, his supporting argument concerns the sufficiency of the evidence to establish that he murdered Norris—a prerequisite to finding him guilty of capital murder. Because appellant has failed to brief his stated point of error, we will not consider it.[20] In the interest of justice, however, we will consider appellant's point of error as a challenge to the sufficiency of the evidence that he murdered Norris.

Appellant argues that the trial evidence showed "at best" that his DNA was in and on Norris' body. Appellant acknowledges that the State's evidence "may support a rational jury's finding of aggravated sexual assault," but he claims that no evidence linked him to Norris' murder. He asserts, "Under *Malik*, the State failed to prove the specific offense charged, and appellant is entitled to an acquittal of that specifically charged offense." He cites *Byrd v.*

---

19. Detective Peter Bisacca, an investigator for the Coalinga State Hospital, strongly refuted the description of appellant as a quiet, unassuming individual. To the contrary, the investigator asserted that appellant was very aggressive and very violent, with a widespread reputation for *repeated* violent outbursts.

20. See Tex.R.App. P. 38.1(i); *Ladd v. State*, 3 S.W.3d 547, 575 (Tex.Crim.App.1999) (holding that traditional notions of fair play and substantial justice are not offended by requiring capital defendants to abide by the Court's briefing rules and to make reasonable arguments on their own behalf).

*State*,[21] which, in turn, cites *Malik v. State*.[22] In *Byrd* and *Malik*, we measured the sufficiency of the State's evidence to prove the specific offense charged against a hypothetically correct jury charge.

In assessing the legal sufficiency of the evidence to support a capital murder conviction, we consider all of the evidence in the light most favorable to the verdict and determine whether, based on that evidence and reasonable inferences therefrom, any rational juror could have found the essential elements of the crime beyond a reasonable doubt.[23] Our review of "all of the evidence" includes evidence both properly and improperly admitted.[24] We give deference to "the responsibility of the trier of fact to fairly resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts."[25] Each fact need not point directly and independently to the appellant's guilt, as long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction.[26]

The State may prove a defendant's identity and criminal culpability by either direct or circumstantial evidence, coupled with all reasonable inferences from that evidence.[27] A lack of direct evidence is not dispositive of the issue of guilt.[28] Circumstantial evidence is as probative as direct evidence in establishing guilt, and circumstantial evidence alone can be sufficient.[29] On appeal, the same standard of review is used for both circumstantial and direct evidence cases.[30]

A hypothetically correct jury charge is a charge that "accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried."[31] The "law as authorized by the indictment" includes the statutory elements of the offense and those elements as modified by the indictment.[32]

In this case, the applicable provision of the Texas Penal Code states, in relevant part, that a person commits capital murder if the person intentionally commits murder in the course of committing or attempting to commit aggravated rape.[33] In a capital murder case, the ele-

21. 336 S.W.3d 242 (Tex.Crim.App.2011).

22. 953 S.W.2d 234, 240 (Tex.Crim.App.1997).

23. *Gardner v. State*, 306 S.W.3d 274, 285 (Tex. Crim.App.2009).

24. *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim.App.2007).

25. *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim.App.2007) (quoting *Jackson v. Virginia*, 443 U.S. 307, 318–19, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)).

26. *Id.*

27. *Gardner*, 306 S.W.3d at 285.

28. *Guevara v. State*, 152 S.W.3d 45, 49 (Tex. Crim.App.2004).

29. *Id.*

30. *Hooper*, 214 S.W.3d at 13 (citing *Guevara*, 152 S.W.3d at 49).

31. *Thomas v. State*, 444 S.W.3d 4, 8 (Tex. Crim.App.2014) (quoting *Malik*, 953 S.W.2d at 240).

32. *Id.* (citing *Curry v. State*, 30 S.W.3d 394, 404 (Tex.Crim.App.2000)).

33. *See Wilder v. State*, 583 S.W.2d 349, 360 (Tex.Crim.App.1979) (citing TEX. PENAL CODE ANN. § 19.03(a)(2) (Vernon 1975)) *vacated and remanded on other grounds by Wilder v. Texas*, 453 U.S. 902, 101 S.Ct. 3133, 69 L.Ed.2d 987 (1981) (remanding the case in light of *Estelle v. Smith*, 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981), which vacated the death sentence because of a punishment phase er-

ments of the aggravated rape and the murder may overlap.[34]

The indictment charged appellant with capital murder as follows:

Defendant, on or about the 24th day of November, A.D. 1975, and before the presentment of this indictment, in the County and State aforesaid, did then and there intentionally cause the death of an individual, namely Sheryl Ann Norris, by strangling the said Sheryl Ann Norris, and the Defendant was then and there in the course of committing or attempting to commit the offense of aggravated rape of Sheryl Ann Norris;

...Defendant, on or about the 24th day of November, A.D. 1975, and before the presentment of this indictment, in the County and State aforesaid, did then and there intentionally cause the death of an individual, namely Sheryl Ann Norris, by drowning the said Sheryl Ann Norris, and the Defendant was then and there in the course of committing or attempting to commit the offense of aggravated rape of Sheryl Ann Norris[.]

Considering all of the evidence in the light most favorable to the verdict, we conclude the jury could reasonably infer that appellant intentionally murdered Norris in the course of committing aggravated rape by the manner and means alleged in the indictment.[35]

The evidence showed that, consistent with her usual routine, Norris left her office and went home for lunch at noon. Contrary to her usual routine, she did not answer the phone when Andrus called her during the lunch hour. A little after 5:00 p.m., when Andrus found Norris' partially-clothed body in the bathroom, two ligatures were tightly knotted around her neck, her head and shoulders were under water, and her submerged watch was stopped at 12:31. Her vaginal and anal areas were soiled with blood and feces. Appellant's DNA profile was identified in semen inside Norris' body and in a hand print on the blouse she was wearing.

A crumpled rug and money scattered on the floor of the otherwise-tidy apartment indicated that a struggle began near the front door and continued into the bedroom. Damaged sheet rock on the wall, and fecal material leading from the bed to the bathroom, indicated that the struggle continued into the bathroom, where Norris' body was found. Investigators observed feces on the floor under Norris' body. Norris' body had been under water for at least four and one-half hours before the crime scene was photographed around 8:00 p.m. The condition and position of Norris' body were consistent with someone intentionally strangling her and drowning her in the course of committing an aggravated rape. Viewing the totality of the evidence, the jury could reasonably infer that appellant

---

ror), *but affirmed by Wilder v. State*, 623 S.W.2d 650 (Tex.Crim.App.1981) (holding that because the governor had commuted the death penalty sentence to life, the error was moot). "In 1983 the former offenses of rape and aggravated rape became sexual assault and aggravated sexual assault respectively." *Ex parte Austin*, 746 S.W.2d 226, 229 (Tex.Crim.App.1988) (citing Acts 1983, 68th Leg., R.S., chap. 977, p. 5311 (H.B.2008)). Texas Penal Code § 22.021 superceded Texas Penal Code § 21.03. *See Stephens v. State*, 806 S.W.2d 812, 813 n. 1 (Tex.Crim.App.1990).

**34.** *See Muniz v. State*, 851 S.W.2d 238, 245 (Tex.Crim.App.1993) (finding no legislative intent to preclude the State from relying on a single act to prove both the murder and the aggravating element of the rape).

**35.** *See Sanchez v. State*, 376 S.W.3d 767, 773–74 (Tex.Crim.App.2012) (stating that when an indictment permitted a conviction for murder under alternative manners and means, the State could obtain a conviction if it proved any one of the alternatives).

intentionally murdered Norris in the course of committing aggravated rape.

Appellant points out that the ligatures used to strangle Norris had been lost by the time of trial. However, the ligatures themselves were not necessary to prove that Norris had been strangled or that appellant was the person who strangled her. The totality of the evidence was sufficient to show that appellant strangled and drowned Norris in the course of committing aggravated rape against her.

Appellant appears to suggests that, even if the evidence established that he had sexual intercourse with Norris, the State's evidence did not rule out the possibility that someone else murdered her. Appellant presented this theory at trial, where the jury rejected it. On the record of this case, appellant's proffered scenario, in which appellant had sexual intercourse with Norris and then someone else entered the apartment and murdered her, strains credulity. There was no evidence that Norris and appellant knew each other. Further, we will not usurp the role of the fact finder by factoring into our sufficiency analysis an alternative "hypothesis inconsistent with the guilt of the accused." [36] Point of error one is overruled.

## ADMISSIBILITY OF DNA EVIDENCE

In point of error two, appellant asserts that the trial court erred in "failing to suppress any and all DNA evidence and testimony due to the failure of the testing to meet quality assurance standards," and therefore his conviction should be reversed. This argument appears to conflate Rule 702, which concerns the admissibility of scientific evidence, with Article 38.23, which concerns the admissibility of illegally obtained evidence. To the extent that appellant's point of error implicates Article 38.23, it is, arguably, multifarious and inadequately briefed.[37] However, in the interest of justice, we will discuss both Rule 702 and Article 38.23 as they apply to appellant's allegations.

Appellant contends that the DNA profile which was uploaded to CODIS did not comply with the Quality Assurance Standards of the Federal DNA Identification Act or Texas' standards. He asserts that both the federal and state standards specify the inclusion of a "reagent blank" as a control when generating a DNA profile, but in this case, those standards were not followed. He points out that DPS analysts submitted a "Deviation Request" seeking approval to run the "MiniFiler" and obtain a DNA profile even though they did not have a "reagent blank" to run with the liquid extract. Appellant reasons that, because the DNA profile which generated the CODIS hit was obtained without the use of the required "reagent blank," the DNA profile should never have been uploaded to the CODIS database.

A trial court's responsibility under Rule 702 is to determine whether proffered scientific evidence is sufficiently reliable and relevant to assist the jury.[38] The proponent of the scientific evidence bears the burden of demonstrating, by

---

36. *See Geesa v. State*, 820 S.W.2d 154, 159 (Tex.Crim.App.1991), *overruled on other grounds by Paulson v. State*, 28 S.W.3d 570, 570 (Tex.Crim.App.2000); *see also Ramsey v. State*, 473 S.W.3d 805, 808 (Tex.Crim.App. 2015) (noting that "[b]eyond a reasonable doubt" does not require the State to "disprove every conceivable alternative to a defendant's guilt").

37. Tex.R.App. P. 38.1(i); *Ladd v. State*, 3 S.W.3d at 575.

38. *Russeau v. State*, 171 S.W.3d 871, 881 (Tex.Crim.App.2005).

clear and convincing evidence, that the evidence is reliable.[39] This is accomplished by showing that: (1) the underlying scientific theory is valid; (2) the technique applying the theory is valid; and (3) the technique was properly applied on the occasion in question.[40] Before scientific evidence may be admitted, the trial court must conduct a hearing outside the presence of the jury to determine whether the proponent has established all three criteria.[41]

■ The record shows that appellant filed a pretrial motion to suppress DNA evidence. In it, he cited the NDIS Operation Procedures Manual and asserted that the quality assurance standards of the Federal DNA Identification Act specified the "inclusion of a reagent blank."[42] He also quoted Texas Administrative Code § 28.26(b), which stated that standards for DNA analysis "shall meet or exceed the current standards for quality assurance

... for forensic DNA analysis issued by the FBI."[43] Appellant stated that, absent DPS's violation of its own DNA testing procedures and FBI quality assurance standards, he would never have been targeted as a suspect. Citing Article 38.23, appellant asserted that "any further results" that "followed from the original violations must also be suppressed as fruits of the poisonous tree."[44] The trial court did not rule on this motion before trial.[45]

At trial, Flores testified before the jury regarding the "checks and balances throughout the screening, extraction, amplification and interpretation processes," the DPS lab's use of proficiency testing and certification for lab personnel, and the fact that the lab is accredited by the American Society of Crime Laboratory Directors. He noted that one quality control measure that the DPS lab uses in conducting a DNA analysis is a reagent blank. In 1997, when Flores made the liquid extract

---

**39.** *Kelly v. State*, 824 S.W.2d 568, 573 (Tex. Crim.App.1992).

**40.** *Somers v. State*, 368 S.W.3d 528, 536 (Tex. Crim.App.2012).

**41.** *Jackson v. State*, 17 S.W.3d 664, 670 (Tex. Crim.App.2000).

**42.** At the hearing on the motion to suppress, defense counsel explained that "NDIS" is the abbreviation for "National DNA Identification System."

**43.** In his motion to suppress DNA evidence, appellant used the terms "FBI standards" and "requirements of the Federal DNA Identification Act" interchangeably. However, these terms are not identical. The federal DNA Identification Act provides, in relevant part, for the Director of the FBI to issue quality assurance standards for DNA analysis performed by forensic laboratories. 42 U.S.C. § 14131(a); *see Rivera v. Mueller*, 596 F.Supp.2d 1163, 1165–66 (N.D.Ill.2009).

**44.** Article 38.23 provides that no evidence obtained by an officer or other person in violation of any provisions of the Constitu-

tions or laws of Texas or the United States shall be admitted against the accused on the trial of any criminal case. Only those acts which violate a person's privacy rights or property interests are subject to this exclusionary rule. *See Miles v. State*, 241 S.W.3d 28, 36 n.33 (Tex.Crim.App.2007); *see also Gonzales v. State*, 67 S.W.3d 910, 912 (Tex. Crim.App.2002) (holding that in order to exclude a juvenile's statement there must be a causal link between the illegal conduct, the Family Code violation, and the making of the statement); *Chavez v. State*, 9 S.W.3d 817, 819–20 (Tex.Crim.App.2000) (holding that evidence obtained outside the geographic boundaries of an Interlocal Assistance Agreement should not be excluded).

**45.** In a status hearing prior to Flores' testimony, defense counsel clarified that this motion only encompassed the CODIS hit and did not cover anything that happened before 2010. The trial judge made a "preliminary ruling" that he would allow testimony about the history and progress of DNA testing, including any progress past 2010.

from the vaginal sample, standard practice was to use a reagent blank, and Flores created one at that time. Flores explained that a reagent blank was a sample that contained the reagent that was used in the extraction but not the biological material. It would be analyzed, or run, along with the forensic sample. If the analysis of the reagent blank led to any kind of profile, this would signify that the reagent was contaminated. Flores testified that such contamination would not alter the DNA profile obtained from the forensic sample; it would just provide additional information. Depending on the strength of the contaminant, this additional information might show up as a "second allele from the same individual" or as a reading that an additional person was present.

Flores further testified that, if a reagent blank is consumed in the first analysis because it comes out negative, then there is no need for a reagent blank in subsequent analyses of the same extract. In this case, Flores prepared a reagent blank when he made the liquid extract. It was consumed by the analysis because it came out negative, which signified that the reagent was not contaminated. Therefore, there was no need to run additional reagent blanks when conducting additional analyses of the same liquid extract. Flores' analysis consumed part of the extract, but he saved a "good bit" for further analysis. Carradine and Kuhlmann used this same liquid extract in later DNA analyses.

After Flores testified, the trial court held a hearing outside the jury's presence on the defense's motion to suppress the DNA evidence. Appellant presented a "Deviation Request" that was dated June 24, 2010, and contained the DPS lab's reference number for this case. In it, a DPS lab analyst requested a deviation from standard procedure, stating:

There are samples that were extracted prior to July 1, 2009 that need to be amplified with additional kits (Identifiler, Yfiler, and/or Minifiler) that do not have remaining reagent blanks. Based upon the more sensitive nature of these kits it would be beneficial to conduct further analysis on samples that were extracted prior to July 1, 2009 to obtain more information for comparisons and potential CODIS upload.

The form also contained signatures of approval and a handwritten note, dated June 25, 2010, reflecting that the request was approved, with conditions that: (1) the case record clearly indicate which samples were amplified with this deviation; and (2) a copy of the deviation be included with the case record.

The State presented an excerpt from the "FBI Quality Assurance Standards Audit for Forensic DNA Testing Laboratories, In Accordance with the Quality Assurance Standards for Forensic DNA Testing Laboratories Effective July 1, 2009." This publication contained a checklist with language providing, in relevant part, that reagent blank controls "shall" be amplified and typed under the same conditions as the forensic sample. The text underneath the checklist included the following explanation: "A reagent blank control is an analytical control sample that contains no template DNA and is used to monitor contamination from extraction to final fragment or sequence analysis. The control is treated the same as, and parallel to, the forensic and/or casework reference samples being analyzed." This text also states that the amplification and typing requirements for reagent blank controls are applicable to samples extracted on or after July 1, 2009. The State also presented a "Deviation Request Supplement" that was dated June 3, 2011, and contained the DPS lab's reference number for this case. This

"Supplement" stated, "Due to a revision in the [Standard Operating Procedure], this deviation is no longer needed."

Defense counsel argued that the 2010 DNA profile should never have been uploaded into the CODIS database because the forensic sample used to obtain the DNA profile was not accompanied by a reagent blank when it was run. Counsel reasoned that, without this "hit" in CODIS, none of the other evidence tying appellant to this offense would have existed. Therefore, counsel asserted, evidence of this hit and all of the inculpatory evidence obtained thereafter should be excluded as the "fruit of the poisonous tree."

The State responded that the reagent blank requirement cited by the defense applied to samples extracted on or after July 1, 2009. Because the sample at issue was extracted in 1997, this requirement did not apply. The State argued that the "Deviation Request" did not establish that the procedures failed to comply with FBI and statutory quality control standards. Further, the State argued, appellant had no constitutional right to particular DNA testing protocols, and therefore any deviation went to the weight of the evidence rather than its admissibility. The trial court denied the motion to suppress, noting that the defense could present the jury with evidence and testimony challenging the DNA evidence.

On appeal, appellant challenges only the third criterion of the test for scientific reliability—whether the technique was properly applied on the occasion in question. *See Somers,* 368 S.W.3d at 536. Appellant relies solely on the DPS lab's failure to run a reagent blank when it analyzed the extract in 2010, which he asserts violated FBI and DPS lab protocols. He submits that the "Deviation Request" establishes that the lab did not follow its own procedures. However, the language of the "Deviation Request" specified that the analyst sought a variance from a procedure that applied to samples extracted on or after July 1, 2009, even though the sample to be analyzed was extracted in 1997. Thus, the request appears to have been filed out of an abundance of caution, and as a means of documenting the procedure that was actually followed.

The only evidence concerning the protocol applicable to the 1997 extract at issue was Flores' testimony. Flores stated that he followed the protocol that was in effect in 1997 by running a reagent blank when he first analyzed the liquid extract. According to the protocol then in effect, other analysts who later tested the same extract did not need to run additional reagent blanks.

Moreover, when the trial court ruled on appellant's motion to suppress, the only evidence concerning the purpose of running a reagent blank was Flores' testimony and the "FBI Quality Assurance" publication, both of which indicated that running a reagent blank could reveal whether the reagent used in the forensic sample was contaminated. Flores further testified that, even if the reagent was contaminated, this contamination would not alter the DNA profile obtained from the forensic sample.

The trial court reasonably determined that the proffered scientific evidence was sufficiently reliable to assist the jury.[46] Therefore, the trial court did not abuse its discretion by determining that the 2010

---

**46.** *See, e.g., Jackson,* 17 S.W.3d at 672 (holding that there was no harm because the State's DNA evidence was in fact reliable, notwithstanding evidence that the State failed to use reagent blanks "to eliminate the possibility of cross-contamination" and that the protocol was later upgraded to include reagent blanks).

DNA evidence was sufficiently reliable and relevant under Rule 702.

Although appellant referred to Article 38.23 in his pretrial motion to suppress, he does not expressly refer to Article 38.23 on appeal. However, his assertion that all inculpatory evidence obtained as a result of the 2010 DNA profile should have been excluded, and his argument that his conviction should be reversed, appear to implicate Article 38.23.

Even if appellant had proven the alleged procedural irregularity, it would not merit the exclusion of evidence under Article 38.23. Creating a DNA profile from a biological sample obtained from Norris' body, and uploading the profile into CODIS, did not implicate appellant's privacy or property rights.[47] Therefore, the DNA profile and the CODIS hit are not subject to exclusion under Article 38.23.[48] For the same reasons, Article 38.23 does not require the exclusion of other inculpatory evidence that, arguably, was obtained as a result of the DNA profile and the CODIS hit.

We conclude that the trial court did not abuse its discretion by denying appellant's motion to suppress the 2010 DNA profile, the CODIS hit, and inculpatory evidence that was obtained after appellant was identified as a suspect. Point of error two is overruled.

## ADMISSIBILITY OF PLEA OFFER

In point of error three, appellant asserts that the trial court erred in not allowing evidence of his willingness to enter a plea "to the jury"[49] to the offense of aggravated sexual assault, because this evidence was relevant to the mitigation special issue.[50]

---

47. *See Maryland v. King,* —— U.S. ——, 133 S.Ct. 1958, 1979, 186 L.Ed.2d 1 (2013) ("[T]he processing of respondent's DNA sample's 13 CODIS loci did not intrude on respondent's privacy in a way that would make his DNA identification unconstitutional."); *see also Segundo v. State,* 270 S.W.3d 79, 99–100 (Tex.Crim.App.2008) (quoting *Johnson v. Quander,* 440 F.3d 489, 498 (D.C.Cir.2006)) (" '[A]ccessing the records stored in the CODIS database is not a 'search' for Fourth Amendment purposes,' because 'the process of matching one piece of personal information against government records does not implicate the Fourth Amendment.' ").

48. *See Miles,* 241 S.W.3d at 36 n. 33 ("Only those acts which violate a person's privacy rights or property interests are subject to the state or federal exclusionary rule."); *cf. Segundo,* 270 S.W.3d at 99 ("Regarding his argument concerning the potential for abuse, appellant has made no showing that any such abuse has occurred in the Texas CODIS system, much less that such abuse occurred in his case.").

49. Appellant speaks of his willingness "to enter a plea of guilty to the jury." While guilty pleas may be entered to a jury, it does not appear from appellant's arguments that he was trying to "enter a plea of guilty to the jury" but rather he was trying to present evidence to the jury of his willingness to plead guilty to a lesser offense. In other words, appellant wanted to present evidence of his plea negotiations—which included an offer to "enter a plea of guilty to the jury"—as mitigation evidence during the punishment phase of his trial. Appellant's point of error will be interpreted as an allegation of error by the trial court in not admitting evidence of his plea negotiations, rather than an allegation of error by the trial court in not allowing appellant to enter a plea of guilty to aggravated sexual assault.

50. He also argues that, without this mitigating evidence, the jury was not provided with an effective vehicle for expressing its reasoned moral response to the evidence before it. We note that the "vehicle" for a jury to express its "reasoned moral response" is the trial court's instruction on the mitigation special issue. *See, e.g., Ex parte Moreno,* 245 S.W.3d 419, 423–26 (Tex.Crim.App.2008). To the extent that appellant intends by this point of error to challenge anything other than the trial court's evidentiary ruling, his claim is inadequately briefed as well as multifarious.

As an initial matter, the record does not support appellant's assertion that he offered to "enter a plea of guilty to the jury" to the offense of aggravated sexual assault. Rather, in his "Defendant's Offer to Enter Pleas of Guilty," filed on April 3, 2013, appellant offered to:

(1) enter a plea of "guilty" to the offense of capital murder in exchange for a sentence of life imprisonment; and to

(2) waive indictment and "any issue of the statute of limitations" and plead "guilty" to a felony information to the first degree felony offense of burglary of a habitation with intent to commit sexual assault.

Appellant also offered to waive his right to parole, "so far as that waiver is possible[,]" and to "make no objection to the State of Texas objecting to him being paroled, ... should the Texas Board of Pardons and Parole ever consider paroling him out of prison." Finally, he offered to enter the pleas on separate dates, "so that the Texas Department of Criminal Justice will not consider them as a single plea, making the pleas a de facto stacking of two life sentences."

Appellant does not state that he attempted to introduce his "Offer" as evidence and that the trial court ruled that it was inadmissible. Nor does he cite to any place in the record where he sought a ruling on the admissibility of this pleading. Therefore, this allegation is inadequately briefed.[51] Nevertheless, our independent review reveals that, in a hearing outside the jury's presence at the end of the defense's punishment case-in-chief, appellant attempted to introduce into evidence his written offer to plead guilty. In response to the State's motion in limine concerning the admissibility of plea negotiation evidence under Texas Rule of Evidence 410, appellant argued that Rule 410 only barred the use of plea negotiations against a defendant; it did not bar the introduction of plea negotiations on a defendant's behalf. He further argued that the prosecutor had opened the door to this evidence by telling witnesses, "We're sorry you have to be here," which (according to defense counsel) gave the jury a false impression that the trial was "all [the defendant's] fault," when in fact the trial could have been avoided if the State had accepted his plea offer.

The prosecutor responded that the purpose of Rule 410 was "to keep plea negotiations or a lack thereof out from [sic] the jury because it's absolutely not relevant to any of the jury's determinations."[52] The prosecutor asserted that the State had "brought in nothing as it relates to plea negotiations," and that simply telling a crying witness, "I'm sorry you're here,"

---

TEX.R.APP. P. 38.1; *see also Linney v. State,* 413 S.W.3d 766, 767–68 (Tex.Crim.App.2013) (Cochran, J., concurring). Nevertheless, we will address appellant's claim concerning the evidentiary ruling.

**51.** TEX.R.APP. P. 38.1(i); *Ladd v. State,* 3 S.W.3d at 575.

**52.** The State objected to the admission of appellant's plea negotiations under Rule 410, but essentially argued at trial that defendant's plea negotiations were not relevant to the jury's decision. We have held that, so long as a party makes the grounds of the objection clear, we will not bar the objection merely on procedural default. *Lankston v. State,* 827 S.W.2d 907, 909 (Tex.Crim.App.1992) ("Straightforward communication in plain English will always suffice. The standards of procedural default, therefore, are not to be implemented by splitting hairs in the appellate courts. As regards specificity, all a party has to do to avoid the forfeiture of a complaint on appeal is to let the trial judge know what he wants, why he thinks himself entitled to it, and to do so clearly enough for the judge to understand him at a time when the trial court is in a proper position to do something about it.") (internal citations omitted).

did not open the door to evidence that was otherwise inadmissible. The prosecutor further asserted that, if the defense introduced evidence of the plea offer, this evidence would open the door to the State's "sharing with the jury why we can't do that," including a discussion of the applicable parole law, which was "a huge part of why ... this hasn't happened." The trial court ruled that the plea offer was inadmissible "pursuant to the Texas Rules of Evidence." Defense counsel then rested its punishment case-in-chief.

 Rule 410 provides, in relevant part:

(b) Prohibited Uses in Criminal Cases.—In a criminal case, evidence of the following is not admissible against the defendant who made the plea or was a participant in the plea discussions:

\* \* \*

(3) a statement made during a proceeding on either of those pleas under Federal Rule of Criminal Procedure 11 or a comparable state procedure; or

(4) a statement made during plea discussions with an attorney for the prosecuting authority if the discussions did not result in a guilty or nolo contendere plea or they resulted in a later-withdrawn guilty or nolo contendere plea.

(c) Exception.—In ... a criminal case, the court may admit a statement described in paragraph (b)(3) or (4), when another statement made during the same plea or plea discussions has been introduced and in fairness the statements ought to be considered together.[53]

We note that Rule 410 is silent on the admissibility of plea negotiations when that evidence is presented for, rather than against, a defendant.[54] However, if the trial court's decision was correct on any applicable theory of law, we will sustain it.[55] This is true even if the judge failed to give any reason or gave the wrong reason for the ruling.[56] On appeal, we review the trial judge's evidentiary rulings under an abuse-of-discretion standard.[57]

We have held that a State's plea offer, presented by a capital defendant at the punishment phase, might be *"minimally relevant"* as tending to show the District Attorney's office's belief that the defendant is not a future danger.[58] Nevertheless, such evidence is not admissible under Rule 403 because it is "substantially outweighed by the danger of both unfair prejudice and of misleading the jury."[59] Admitting evidence of plea negotiation also runs the risk of confusing the issues by leading the jury down a path of inquiry into the motivations behind each party's plea offer.[60] Further, allowing a defendant to introduce evidence at trial of a sentence offered by the State during plea negotiations clearly militates against public policy favoring the conclusion of litigation by compromise and settlement because it

**53.** TEX.R. EVID. 410.

**54.** *See Smith v. State,* 898 S.W.2d 838, 842 n. 4 (Tex.Crim.App.1995), *overruled in part by Tennard v. Dretke,* 542 U.S. 274, 283–89, 124 S.Ct. 2562, 159 L.Ed.2d 384 (2004).

**55.** *Prystash v. State,* 3 S.W.3d 522, 527 (Tex. Crim.App.1999).

**56.** *Bowley v. State,* 310 S.W.3d 431, 434 (Tex. Crim.App.2010).

**57.** *Id.*

**58.** *Prystash,* 3 S.W.3d at 527–28; *Smith,* 898 S.W.2d at 843 (emphasis in originals).

**59.** *Prystash,* 3 S.W.3d at 528; *see also Martinez v. State,* 327 S.W.3d 727, 737 (Tex.Crim. App.2010) (stating that the danger of unfair prejudice exists when evidence has the potential to impress the jury in an irrational way).

**60.** *Cf. Prystash,* 3 S.W.3d at 528.

discourages the State from making such offers in the future.[61]

In this case, like the defendants in *Smith* and *Prystash*, appellant attempted to introduce his own plea offer as evidence in mitigation of punishment. However, appellant offers little argument as to how the jury is to infer mitigation from his plea offer other than it was not his fault that the trial went forward instead of resulting in a plea bargain.[62] In a capital case, the defendant's offer to plead guilty in exchange for a sentence other than death inures to his benefit if the State accepts it, and, if the State rejects it, the defendant is no worse off than he was before. Arguably, therefore, evidence of such a self-serving plea offer is not even *"minimally relevant"* to the mitigation special issue.[63]

■ Even assuming that appellant's plea offer evidence was minimally relevant, any probative value of this evidence was substantially outweighed by the dangers of unfair prejudice and misleading the jury.[64] A Rule 403 analysis includes, but is not limited to, the following factors: (1) the probative value of the evidence; (2) the potential to impress the jury in some irrational, yet indelible, way; (3) the time needed to develop the evidence; and (4) the proponent's need for the evidence.[65] Any probative value of appellant's plea offer was diluted by the various motivations that may have driven appellant's and his attorneys' decision to make the offer. Indeed, evidence of a capital defendant's own plea offer is even less probative and poses an even greater danger of misleading the jury than does evidence of a State's plea offer because the defendant potentially benefits, by offering to plead guilty in exchange for a sentence other than death. Without additional evidence of appellant's and his attorneys' motivations, the jury could only speculate as to the mitigating value, if any, of appellant's plea offer evidence. As such, the potential for this evidence to affect the jury in an irrational way was high.[66] Thus, any arguably probative value of appellant's plea offer evidence would have been substantially outweighed by the danger of unfair prejudice and misleading the jury.[67]

**61.** *Id.*

**62.** Circumstantial evidence poses relevance problems because a judge must decide whether a jury may permissibly make the jump from the proved fact to the inferred fact. David Schlueter, Texas Rules of Evidence Manual 180 (9th ed., 2012)

**63.** *See* Tex.R. Evid. 401; *Tennard*, 542 U.S. at 284–85, 124 S.Ct. 2562 (describing relevant mitigating evidence as evidence which tends logically to prove or disprove some fact or circumstance which a fact-finder could reasonably deem to have mitigating value).

**64.** *See Smith,* 898 S.W.2d at 844.

**65.** *Hernandez v. State*, 390 S.W.3d 310, 324 (Tex.Crim.App.2012).

**66.** *Cf. Anderson v. State*, 416 S.W.3d 884, 888 (Tex.Crim.App.2013) (stating that juries are permitted to draw reasonable inferences from the evidence but they are not permitted to draw conclusions based on speculation); *Hernandez,* 390 S.W.3d at 324 (stating that juries should not consider evidence that depends on mere sympathy or emotional response in determining a defendant's death worthiness); *Ex parte Moreno*, 245 S.W.3d at 426 n. 20 (noting that juries must be able to weigh evidence which tends logically to prove or disprove some fact or circumstance which a fact-finder could reasonably deem to have mitigating value).

**67.** To the extent that appellant intends to argue that the exclusion of his plea offer was unconstitutional, we have held that the federal constitution does not require the admission of mitigating evidence that is otherwise objectionable under state law. *See Renteria v. State*, 206 S.W.3d 689, 697 (Tex.Crim.App. 2006); *Lewis v. State*, 815 S.W.2d 560, 568 (Tex.Crim.App.1991) (concluding that the federal constitution does not require admission of a defendant's self-serving, out-of-court dec-

We also recognize that allowing a defendant to present evidence of his own plea offer militates against public policy favoring the conclusion of litigation by compromise and settlement. Just as allowing a defendant to introduce a plea offer from the State would discourage the State from making such offers in the future,[68] allowing a defendant to introduce his own plea offer would encourage defendants to make plea offers in order to develop evidence for later proceedings, rather than to conclude the litigation through good-faith negotiation.[69]

 The decision to admit or exclude appellant's plea offer evidence was soundly within the discretion of the trial judge.[70] This evidence was, at best, minimally relevant, and its probative value, if any, was substantially outweighed by the danger of unfair prejudice and misleading the jury. We conclude that the trial court did not abuse its discretion by excluding it. Point of error three is overruled.

### JUROR MISCONDUCT

 In point of error four, appellant asserts that the trial court erroneously denied the defense's motion for mistrial after juror misconduct was brought to the trial court's attention. Appellant asserts that, as a result of a juror's improper conversation with an outside party, he did not receive a fair and impartial trial.

The record shows that, on Thursday, June 6, 2013, during the punishment phase, the trial court adjourned the proceedings until the following Monday, June 10, 2013. On Monday morning, before the presentation of evidence resumed, Judith Kama Davis, an attorney unrelated to this case, informed the trial court that one of the jurors, Tim Altenhoff, had communicated with a third party about the case over the weekend. Specifically, he had "texted" Jan Ellis, a friend who lived in New York, asking her to call him so that he could tell her about a murder case on which he was serving as a juror. Concerned that Altenhoff's conduct might be illegal, Ellis contacted Davis, whom Ellis knew socially. Ellis sent Davis copies of the texts that Altenhoff had sent to her, as well as his "electronic contact card" which included his name and telephone numbers. Davis read the following text exchanges into the record:

> [Altenhoff to Ellis]: What's up? If you have a few minutes, give me a call at home and I'll tell you what I can about the murder trial I'm on.

> [Ellis to Davis]: Somebody from San Marcos sent me this text. Isn't that illegal for a juror?

> [Davis to Ellis]: Yes, that's "expletive" illegal. Who sent it? The sentencing phase is going down this week and the guy might get the death penalty.

> [Ellis to Davis]: If I tell you .... he will know it was me. It is probably illegal for me not to report it even from New York?

> [Davis to Ellis]: Jan, if he's telling you stuff and you're in New York, I can guarantee he's talking to other people,

---

larations of remorse that are inadmissible under state law, even though remorse "may well be" a mitigating circumstance).

**68.** See Smith, 898 S.W.2d at 844 n.6.

**69.** Cf., e.g., Ex parte Heilman, 456 S.W.3d 159, 166–69 (Tex.Crim.App.2015) (emphasizing the "sanctity and finality" of good-faith, arm's length plea agreements); State v. Munoz, 991 S.W.2d 818, 822–24 (Tex.Crim.App. 1999) (finding that, in evaluating a claimed violation of the speedy trial guarantee, "good faith plea negotiations" were a valid reason for delay that did not weigh against the prosecution).

**70.** See Prystash, 3 S.W.3d at 528.

too. He likely won't know it's you. Has he given you any specific info like the name of the case? And, yes, you have to report him.

\* \* \*

[Ellis to Davis]: I just texted him back and asked him what was the name of the case. I'm sure he is asleep....

\* \* \*

[Davis to Ellis]: Jan, you remember the 1974 event. Did you know Mr. A at the time? Did he know about the event? Did y'all discuss the event around the time it happened?

[Ellis to Davis]: 1975, the year. I do not remember any discussions. We were in high school and everybody knew about it.

\* \* \*

[Altenhoff to Ellis]: State versus Willie Jenkins.

[Ellis to Altenhoff]: That can't be the one from when we were in high school?

[Altenhoff to Ellis]: Yep.

The prosecutor asked Davis if she knew why Altenhoff contacted Ellis about the case. Davis stated that Ellis and Altenhoff had been friends for many years, and Ellis told her that Altenhoff "probably ha[d] a boring life" and was "excited probably to be on a jury in a case of this magnitude." Ellis also suggested that Altenhoff might have believed that he was not breaking any rules by contacting Ellis since she lived in New York.

In addition, Davis noted that Ellis told her that Altenhoff's father had been a probation officer in San Marcos around the time of the instant offense. Ellis indicated to Davis that Altenhoff's father might have had information about the case in 1975 and that he might have discussed it with Altenhoff.

Defense counsel then moved for a mistrial, expressing his concern that Altenhoff might have lied during jury voir dire when he denied having prior knowledge of the case. The judge pointed out that they did not yet know whether Altenhoff had lied during voir dire. The parties and the judge discussed questioning Altenhoff about what he had shared with Ellis and whether he had committed perjury during voir dire. They agreed that Altenhoff needed the assistance of counsel before they questioned him. The bailiff separated Altenhoff from the rest of the jurors, and the judge appointed counsel to represent him.

The parties and the judge also agreed that the judge would question the rest of the jurors as to whether Altenhoff had shared any outside information about the case, and whether they were aware of him violating any of the court's other instructions. The judge questioned each juror individually. Each juror denied that Altenhoff had shared outside information about the case, and each juror denied knowing whether Altenhoff had violated the court's other instructions. The judge concluded that Altenhoff had not shared any outside information about the case with the rest of the jury.

Defense counsel again expressed concern that Altenhoff might have lied during voir dire. Counsel also worried that Altenhoff's vote at the guilt-or-innocence phase might have been tainted by his prior knowledge of the case. Counsel requested an opportunity to question Altenhoff about these matters, and the State agreed that such questioning would be appropriate. The State offered to grant Altenhoff use immunity in the event that his answers subjected him to a prosecution for perjury.

However, when Altenhoff entered the courtroom, he expressly waived both use immunity and his Fifth Amendment right to remain silent. He agreed to answer all

of the judge's and parties' questions. Defense counsel first asked Altenhoff whether he had been in high school in San Marcos in 1975, and Altenhoff confirmed that he had been. Counsel then asked him whether the murder "was a big deal in San Marcos back then." Altenhoff responded, "I'm assuming it was. But ... I honestly do not remember anything about this until I was called for jury duty." He denied that he knew anything about the case when he completed the written juror questionnaire. He stated that he still did not recall the case. Altenhoff testified that the first time he knew that the instant offense had happened was when he reported for jury duty. Altenhoff specifically denied that anything he heard in the courtroom "jog[ged] [his] memory" about the case, and he reiterated that he still did not recall knowing about the case while he was in high school. The questioning continued:

[Counsel]: And the—during the individual voir dire when—back on, I think it was, May the 14th when we had you in here where everybody was questioning you—

[Altenhoff]: Yes.

[Counsel]:—you were asked several times in several ways whether you knew anything about the case.

[Altenhoff]: That's correct. And I did not.

[Counsel]: And yet today we get information that you knew that this happened back in—when you were in high school. So you assume—

[Altenhoff]: The only way I knew that was when the lady asked me in a text: Oh, is that the case [from] when we were in high school? And only because of what I know now, my answer was—I believe, specifically: Yep. That was it. Because of what I know now, not what I remembered from 1975. I did not remember that.

[Counsel]: And so you're saying that nothing that you heard at the first general voir—the—the first day when you filled out the—the questionnaire during general voir dire or during individual voir dire, none of that jogged your memory to—

[Altenhoff]: It did not, sir. No, sir.

[Counsel]: And you only decided that you knew about this case when somebody else said: Oh, is that that case that happened back in high school?

[Altenhoff]: Right. And that's—I could confirm that, yes, that must be because they told us it was 1975 and I was a senior in high school. But it—it didn't jog my memory as to knowing about it or remembering about it from high school. It was only because I learned here that, yes, that is when it was.

[Counsel]: And when did you realize that this was that case from high school, not until she said something?

[Altenhoff]: Well, when I knew from being here in the courtroom that when it happened was 1975. I knew where I was at that time. But still, until this case began or the trial began, I still did not recall knowing about it in high school. I know about it now because of being called for jury duty. That is the only reason I know about it.

[Counsel]: And you didn't think it might be a good idea to let the Judge know that this was something that you might know something about?

[Altenhoff]: I didn't know anything about it. I only know what I've learned in the last few weeks.

The judge then excused Altenhoff and advised him that the court would send him an order to show cause why he should not be held in contempt "because of these text messages." He admonished Altenhoff not to communicate in any way with the re-

maining jurors. The judge also appointed an alternate juror to replace Altenhoff.

Defense counsel then re-urged his motion for a mistrial. He argued that Altenhoff remembered the case because he was in high school in San Marcos when it happened. He stated that, if the defense had known during voir dire that Altenhoff remembered the case, they would have challenged him for cause and then, if the court denied the challenge, they would have exercised a peremptory strike against him. Counsel argued, "Just even the bare fact that he—that—that he knew about this case or had heard about this case basically kept us from intelligently exercising our peremptory challenges in this case and we would move the Court for a mistrial." The judge noted that Ellis, not Altenhoff, was the person who remembered the case from high school. He found Altenhoff's testimony denying prior knowledge of the case to be credible, and he denied the motion for mistrial.

 Article 36.22 provides that no person shall be permitted to converse with a juror about the case except in the presence and by the permission of the court.[71] Once proven, a violation of Article 36.22 triggers a rebuttable presumption of injury to the accused, and a mistrial may be warranted.[72] When determining whether the State sufficiently rebutted the presumption of harm, the evidence is viewed in the light most favorable to the trial court's ruling and deference is given to the

trial court's resolution of historical facts and its determinations concerning credibility and demeanor.[73] We consider only those arguments that were before the court at the time of the ruling.[74] We review a trial court's denial of a mistrial for an abuse of discretion.[75]

 Whether an error requires a mistrial must be determined by the particular facts of the case.[76] A mistrial is an extreme remedy that should be granted only if residual prejudice remains after less drastic alternatives have been explored.[77] Less drastic alternatives include instructing the jury to consider as evidence only the testimony and exhibits admitted through witnesses on the stand, and, if an instruction alone does not sufficiently cure the problem, questioning the jury about the extent of any prejudice.[78] The primary goal of Article 36.22 is to insulate jurors from outside influence.[79] Thus, the effectiveness of possible remedies for an Article 36.22 violation will be determined in part by whether the conversation influenced the juror.[80]

 We note as an initial matter that appellant's complaint on appeal does not comport with his arguments to the trial court. Before the trial court, appellant expressed concern over the possibility that Altenhoff had lied during voir dire about having prior knowledge of the case, and that he might have communicated his outside knowledge to the rest of the jury. Now, appellant argues that the question of

**71.** *See Hughes v. State,* 24 S.W.3d 833, 842 (Tex.Crim.App.2000).

**72.** *See Ocon v. State,* 284 S.W.3d 880, 884 (Tex.Crim.App.2009).

**73.** *Quinn v. State,* 958 S.W.2d 395, 401–02 (Tex.Crim.App.1997).

**74.** *Ocon,* 284 S.W.3d at 884.

**75.** *Id.*

**76.** *Id.*

**77.** *Id.* at 884–85.

**78.** *Id.* at 885.

**79.** *Id.* at 884.

**80.** *Id.*

whether the trial court erred must focus on whether Altenhoff was biased as a result of the improper conversation, and Altenhoff's motivation for engaging in it. We need not consider these arguments because they were not before the trial court at the time of the ruling.[81]

Considering the arguments that were before the trial court, we defer to the trial court's findings that Altenhoff's testimony denying prior knowledge of the case was credible and that Altenhoff did not communicate any outside knowledge to other jurors. We conclude that the trial court properly employed less drastic measures that effectively insulated the jury from outside influence and sufficiently cured the problem created by Altenhoff's misconduct. The trial court did not abuse its discretion in denying appellant's motion for mistrial. Point of error four is overruled.

### CUMULATIVE EFFECT

In point of error five, appellant asserts, "the cumulative impact of the above errors was so great that reversal is required." Appellant "urges the Court to consider the cumulative impact of the errors present at the pretrial, trial and sentencing proceedings on the outcome of his case." Appellant argues that "the cumulative impact of the many errors in this case is so great that reversal is required because the Court cannot be confident that the constitutional errors can be determined beyond a reasonable doubt not to have contributed" to his conviction and sentence. He also asserts that the "many non-constitutional errors" cumulatively affected his substantial right to a fair trial and sentencing.

In his four preceding points of error, appellant failed to show that the trial court erred. Therefore, there is no error to cumulate.[82] Likewise, to the extent that appellant means to allege cumulative harm from every point of error enumerated in his appellate brief, we have not concluded that the trial court erred with respect to any point of error. Point of error five is overruled.

### JURY INSTRUCTIONS

■ In point of error six, appellant asserts, "The trial court violated the Sixth, Eighth and Fourteenth Amendment[s] of the United States Constitution by failing to instruct the jury that a vote by one of them would result in a life sentence despite the statutory requirement of ten votes for a 'No' answer to the question of future dangerousness, or for a 'Yes' vote to a finding of a mitigating circumstance." Appellant asserts that the jurors who decided his sentence "were actively struggling with the sentence they wished to impose." Appellant reasons that the "10–12 Rule" may have resulted in the imposition of the death penalty, despite jurors' inclinations, because the rule obstructs jurors' ability to reach a "true verdict." He acknowledges that we have previously denied similar challenges, but he urges us to reconsider.

The trial court's instructions complied with Article 37.0711, § 3(d)(1) and (2). Appellant does not refer us to any part of the record in support of his assertion that jurors "were actively struggling" with the special issues. Nor have we, in our independent review, identified any part of the

**81.** *Id.*

**82.** *See Gamboa v. State,* 296 S.W.3d 574, 585 (Tex.Crim.App.2009) (quoting *Chamberlain v. State,* 998 S.W.2d 230, 238 (Tex.Crim.App. 1999)) ("Though it is possible for a number of errors to cumulatively rise to the point where they become harmful, we have never found that 'non-errors may in their cumulative effect cause error.' ").

record that supports this assertion. In any event, we are not persuaded to reconsider our previous decisions rejecting similar challenges.[83] Point of error six is overruled.

In point of error seven, appellant alleges that the trial court violated the Eighth and Fourteenth Amendments of the United States Constitution by failing to provide four specific jury instructions concerning the jury's consideration of victim impact evidence at the punishment phase. He complains that the trial court failed to instruct the jury that: (a) "its consideration of victim impact evidence should not be conducted in connection with the future dangerousness special issue"; (b) "its consideration of victim impact evidence did not relieve the State of its burden to prove the 'future dangerousness' issue beyond a reasonable doubt"; (c) it should "disregard victim impact evidence that was not shown to be within the knowledge or reasonable expectation of the defendant"; and (d) it should not "make a comparative worth analysis of the value of the victims [sic] to their [sic] families and the community compared to the defendant or other members of society."

Appellant asserts that "considerable victim character and impact evidence was introduced," notably from Norris' sisters, who testified that Norris' parents died without knowing who killed their daughter.[84] Appellant complains that the jury's consideration of this evidence should have been limited by the above-described jury charges. Absent these charges, he argues, this evidence improperly encouraged the jury to make a decision based on an arbitrary and random factor that bore no relation to appellant's future dangerousness.[85] Appellant asserts that he could not have known about the victim's relationship with her sisters or the effect of her death on her parents. He also asserts that, although the prosecutor did not explicitly compare the relative worth of the victim, appellant, and other members of society, "a full instruction on those concerns should have been given in order to insure that the jury's discretion was focused according to the law."

Appellant never requested these instructions in the trial court. Therefore, he is entitled to relief only if the record shows that the jury charge contained error, and the error resulted in egregious harm.[86] Appellant has not cited any authority that mandates these four instructions. In *Mays v. State*,[87] we disposed of nearly identical claims by recognizing that the trial judge submitted a jury charge consistent with applicable state statutes that met federal constitutional requirements.[88] As in *Mays*, the jury charge in this case was consistent with applicable

---

83. *See Soliz v. State*, 432 S.W.3d 895, 904 (Tex.Crim.App.2014).

84. Appellant's factual assertion is at odds with the record, which included Norris' sisters' testimony that their mother was alive at the time of trial and that their father learned, before he died, that police investigators had identified a suspect through DNA evidence.

85. Appellant also suggests that the victim-impact evidence in this case was unduly prejudicial. To the extent that appellant intends to complain about the admissibility of this evidence, we note that he did not object to its admission at trial. *See* Tex.R.App. P. 33.1. In any event, this additional legal theory would render his point of error multifarious, and we decline to address it. *See Mays v. State*, 318 S.W.3d 368, 390 n. 82 ( Tex.Crim.App.2010).

86. *See Price v. State*, 457 S.W.3d 437, 440 (Tex.Crim.App.2015).

87. 318 S.W.3d at 391.

88. *Id.* (citing *Saldano v. State*, 232 S.W.3d 77, 106 (Tex.Crim.App.2007)).

state statutes that met federal constitutional requirements. Point of error seven is overruled.

In points of error eight through eleven, appellant asserts that the trial court violated the Eighth and Fourteenth Amendments when it failed to define the terms "probability," "criminal acts of violence," "militates," and "continuing threat to society" in the jury instructions at the punishment phase. Appellant argues that failing to define these terms creates a "substantial risk of arbitrariness and caprice." As appellant acknowledges, we have previously rejected these claims.[89] We are not persuaded to reconsider our prior decisions.

Appellant also states that "legislative policy concerns regarding discrimination on the basis of race and ethnicity expressed in the statute would be well served by an instruction" precluding consideration of a defendant's age, race, sex, national origin, religion, political views or sexual orientation as factors supporting a death sentence. Appellant cites no authority for his position that the trial court erred by failing to provide such an instruction.[90] Points of error eight through eleven are overruled.

In point of error twelve, appellant asserts that the trial court violated the Eighth and Fourteenth Amendments "by failing to instruct the jury so as to limit the scope of militating evidence to that which a juror might regard as increasing the defendant's moral blameworthiness." Appellant argues that, without such an instruction, the sentencing determination was not "directly related to the personal culpability of the offender," and "the jury instruction as given failed to preclude the jurors from giving weight to factors beyond [appellant's] own control." This point of error essentially repeats point of error ten, in which appellant argued that the court erred by failing to define "militates." Point of error twelve is without merit for the same reason that point of error ten is without merit.[91]

In argument, appellant also alleges that the statutorily-mandated language that "the jury shall consider mitigating evidence to be evidence that a juror might regard as reducing the defendant's moral blameworthiness" was "inexplicably" omitted from the jury charge. Contrary to appellant's allegation, the record establishes that the written jury charge included the statutorily-mandated language. The charge stated, in relevant part, "In answering Special Issue Number Three you shall consider mitigating evidence to be evidence that a juror might regard as reducing the defendant's blameworthiness." In addition, the trial judge read this language out loud when he read the charge to the jury. Point of error twelve is overruled.

In point of error thirteen, appellant asserts that the trial court violated the Eighth and Fourteenth Amendments by failing to instruct the jury that its finding of guilt in the first phase of the trial did not foreclose consideration of evidence which they believed tended to reduce appellant's moral blameworthiness. Appellant urges that, given the heightened need

89. See, e.g., Leza v. State, 351 S.W.3d 344, 362 (Tex.Crim.App.2011) (finding no constitutional violation in failing to define "militates," "criminal acts of violence," and "probability"); Gardner, 306 S.W.3d at 302–03 (finding no constitutional violation in failing to define "probability," "criminal acts of violence,"

"militates," and "continuing threat to society").

90. See Tex.R.App. P. 38.1(i); Ladd v. State, 3 S.W.3d at 575.

91. See Gardner, 306 S.W.3d at 302–03.

for accuracy in a capital case, the trial court should have given such an instruction to ensure that the jury understood that its consideration of culpability at sentencing was not foreclosed by the guilty verdict.

We rejected a similar allegation in *Russeau v. State*.[92] In that case, we found that the trial court's instructions, which followed the instructions set forth in Article 37.071, § 2(d)(1) and (f), did not track the language of the instruction that appellant argued was constitutionally required, but they had much the same meaning.[93] As such, the trial court's instructions were sufficient to convey to the jury that a finding of guilt did not foreclose consideration of mitigating evidence.

In this case, the trial court's instructions followed the instructions set forth in Article 37.0711, § 3(e) and (f), which are substantially the same as the instructions set forth in Article 37.071, § 2(d)(1) and (f).[94] We presume that the jurors understood and followed the instructions, absent evidence to the contrary.[95] Appellant points to no evidence to the contrary.[96] Point of error thirteen is overruled.

In point of error fourteen, appellant asserts that the trial court violated the Eighth Amendment by failing to instruct

---

**92.** *See* 291 S.W.3d 426, 436 (Tex.Crim.App. 2009). In *Russeau,* the appellant argued that the trial court was constitutionally required "to instruct the jury that [the] finding of guilt in the first phase of the trial did not foreclose consideration of evidence which they believed tended to reduce the moral blameworthiness of the defendant." *Id.*

**93.** *See Id.*

Article 37.071, § 2(d)(1) provides that the court shall charge the jury that, in deliberating on the future dangerousness and "anti-parties" special issues submitted under Subsection (b), the jury "shall consider all evidence admitted at the guilt or innocence stage and the punishment stage, including evidence of the defendant's background or character or the circumstances of the offense that militates for or mitigates against the imposition of the death penalty."

Article 37.071, § 2(f) provides that the court shall charge the jury that in answering the mitigation special issue submitted under Subsection (e), the jury:

(1) shall answer the issue "yes" or "no";
(2) may not answer the issue "no" unless it agrees unanimously and may not answer the issue "yes" unless 10 or more jurors agree;
(3) need not agree of what particular evidence supports an affirmative finding on the issue; and
(4) shall consider mitigating evidence to be evidence that a juror might regard as reducing the defendant's moral blameworthiness.

**94.** Article 37.0711, § 3(e) provides that the court shall instruct the jury that if the jury returns an affirmative finding on each issue submitted under Subsection (b) (deliberateness, future dangerousness, and, if applicable, provocation), it shall answer the following issue:

Whether, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed.

Article 37.0711, § 3(f) provides that the court shall charge the jury that, in answering the issue submitted under Subsection (e), the jury:

(1) shall answer the issue "yes" or "no";
(2) may not answer the issue "no" unless it agrees unanimously and may not answer the issue "yes" unless 10 or more jurors agree; and
(3) shall consider mitigating evidence that a juror might regard as reducing the defendant's moral blameworthiness.

**95.** *Crenshaw v. State,* 378 S.W.3d 460, 467 (Tex.Crim.App.2012).

**96.** *See Colburn v. State,* 966 S.W.2d 511, 520 (Tex.Crim.App.1998).

the jury that: (a) there is no presumption in favor of death, even if the jury found appellant to be a "future danger;" and (b) the mitigation special issue should be taken up and considered independently, without regard to the finding on the future dangerousness special issue. Appellant appears to assert that the instructions for the future dangerousness and mitigation special issues, found in Article 37.0711, §§ 3(b)(2) and (e), do not protect his rights under the Eighth Amendment. He argues that the Legislature intended "that a life sentence have preference over a death sentence," and since death is "clearly not the 'presumed' or 'default' punishment," the trial court erred by not spelling this out to the jury and by not explaining that the mitigation special issue was independent from the future dangerousness issue.

We rejected a similar claim in *Rousseau*.[97] In that case, we found that the trial court's instructions, which followed the instructions set forth in Article 37.071, § 2(e)(1), conveyed to the jury that, if the jury answered the future dangerousness and anti-parties special issues in the affirmative, then the jury would proceed to answer the mitigation special issue either "yes" or "no."[98] We concluded that nothing in our law required a further instruction that there was "no presumption in favor of death."[99] In this case, the trial court's instructions followed the instructions set forth in Article 37.0711, § 3(e), which are substantially the same as the instructions set forth in Article 37.071, § 2(e)(1). Point of error fourteen is overruled.

In point of error fifteen, appellant asserts that the trial court violated the Eighth Amendment when it "failed to instruct the jury so as to provide a vehicle for a juror to return a life verdict where the juror concludes that the aggravating factors, although established by the evidence, still are not so severe as to call for death as a punishment." Appellant argues that Article 37.0711, § 3(b)(2), which requires the jury in a capital case to decide whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society, provides no means for the jury to assess a life sentence if it believes that the aggravating factor of future danger exists but is not so severe as to warrant a death sentence. He suggests that a juror might find that appellant was a future danger, but that the future dangerousness risk was so low that a death sentence was inappropriate. However, if the juror did not find sufficient mitigating evidence, his findings would still result in a death sentence. Appellant argues that the charge is unconstitutional because it would not empower the jury to give effect to the evidence under those circumstances.

We rejected a similar claim in *Rousseau*.[100] In that case, we found that the trial court's instructions met the requirements of Article 37.071, and Article 37.071, in turn, met the requirements of the Eighth Amendment.[101] Appellant does not distinguish the relevant provisions of Article 37.071, which we upheld in *Rousseau*, from the substantially similar provisions of Article 37.0711 that applied to this case. Point of error fifteen is overruled.

In point of error sixteen, appellant asserts that the trial court erred "when it refused to quash the indictment because a

---

97. *See* 291 S.W.3d at 436.

98. *See id.* at 431 n. 1, 436.

99. *See id.* at 436.

100. *See* 291 S.W.3d at 436.

101. *See id.; see also Mays*, 318 S.W.3d at 396–97.

grand jury had not considered and alleged in an indictment the facts legally essential to [appellant's] conviction and death sentence." He further asserts that this error violated the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.[102] He argues that he "was entitled to grand jury consideration of all specific facts essential to his conviction and death sentence as a matter of federal constitutional law." Appellant recognizes that we have previously rejected this allegation.[103] We are not persuaded to reconsider our previous decisions. Point of error sixteen is overruled.

■■■■ In point of error seventeen, appellant asserts that the trial court erred in denying his motion to preclude the death penalty as a sentencing option due to violations of his rights under the Equal Protection Clause. He contends that Article 37.0711 is unconstitutional because there are no uniform, statewide standards to guide prosecutors in deciding when to seek the death penalty. In support of this claim, appellant cites to the United States Attorneys' Manual[104] as an example of written standards already used by federal prosecutors for guiding death penalty prosecutions. The U.S. Attorney's protocol, which establishes a central authority for assessing and authorizing death penalty prosecutions, is set up to ensure that bias based on race or ethnic origin plays

no role in the decision to seek the death penalty and that all defendants are treated in a consistent and fair manner. Considering the decline in the number of prosecutions in which the death penalty is sought,[105] the federal system's protocol might be a workable alternative to the current system. However, taking the decision to pursue the death penalty away from district attorneys' offices in individual counties and vesting that authority in the Texas Attorney General's Office or some other central authority would require legislative action.

There is nothing inherently unconstitutional about having individual district attorneys' offices make the decision to pursue the death penalty without the benefit of uniform, statewide standards.[106] Moreover, appellant's case would not likely persuade the Legislature to adopt a uniform, statewide system for pursuing death penalty prosecutions. Appellant was convicted of a particularly brutal rape and murder. During the punishment phase of appellant's trial, the State presented evidence that appellant sexually molested his stepdaughters, was convicted of four rapes in California, and was convicted of one rape in Texas. Appellant pled guilty to one of the California rapes only four days before he drove to Texas and murdered the victim in this case, Sheryl Norris. In 2001

---

102. He also asserts that this alleged error violated Article I, Sections 2, 10, and 19 of the Texas Constitution. Because appellant does not provide separate authority or argument for his state constitutional claim, we do not address it. *See Berry v. State*, 233 S.W.3d 847, 855 n. 3 (Tex.Crim.App.2007).

103. *See Roberts v. State*, 220 S.W.3d 521, 534–35 (Tex.Crim.App.2007).

104. USAM § 9–10.10 et seq. (1995). Federal death penalty procedure is based on the Federal Death Penalty Act of 1994, codified at 18 U.S.C. §§ 3591 to 3599.

105. According to the Texas Department of Criminal Justice only 13 executions took place in 2015, which is down from a high of 40 executions in 2000. Tex. Dept.Crim. Just.: Executions Dec. 7, 1982 through Feb. 18, 2016 *available at* https://www.tdcj.state.tx.us/death_row/dr_executions_by_year.html.

106. *Cantu v. State*, 939 S.W.2d 627, 649 (Tex. Crim.App.1997); *McCleskey v. Kemp*, 481 U.S. 279, 107 S.Ct. 1756, 95 L.Ed.2d 262 (1987).

Appellant was civilly committed as a sexually violent predator in California. Even being institutionalized did not slow down appellant's propensity for violence. During the punishment phase, the State was allowed to present evidence of appellant's assaults in California on four different inmates as well as institution staff. Appellant also committed violent assaults against several Texas institution inmates. Of particular note was evidence that other inmates convicted of violent crimes—one being a Mexican Mafia member convicted of murder—asked to be moved out of a cell they shared with appellant because of his violence. Appellant's tendency toward violence is so extreme that even other violent inmates feel unsafe around him.

Appellant cites to death penalty statistics on the race of death penalty defendants as evidence of racial bias in Harris County and Texas in general, but appellant has the burden of showing "the existence of purposeful discrimination."[107] Appellant has not carried that burden and makes no showing of any racial bias against himself specifically.[108] Furthermore, the Legislature, not this Court, is tasked with crafting the procedure by which sentences of death are pursued.[109] We have repeatedly rejected similar claims of Equal Protection violation.[110] We are not persuaded to reconsider our previous decisions. Point of error seventeen is overruled.

In point of error eighteen, appellant asserts that the trial court violated his Eighth Amendment rights, "in that the sentencing phase instructions failed to provide the jury the opportunity to have its decision reflect a 'reasoned moral response' to the offender and his offense." Appellant contends that the jury instructions failed to provide a rational process to determine life or death. He states that, by failing to specify that jurors could consider mitigation evidence apart from its relationship to the future dangerousness special issue, the jury instructions failed to meet the Eighth Amendment's guarantee of individualized sentencing.

This Court has rejected similar claims, finding that the applicable state statutory provisions instruct the jury to take into consideration "all the evidence"—not just evidence a juror might consider mitigating—when determining whether there are sufficient mitigating circumstances to warrant the imposition of a sentence of life imprisonment.[111] In this case, the jury instructions were consistent with the applicable state statutes. It is presumed that the jurors understood and followed the instructions, absent evidence to the contrary.[112] Appellant has not provided such evidence.[113] Point of error eighteen is overruled.

In point of error nineteen, appellant asserts that the trial court violated the Eighth and Fourteenth Amendments

107. *McCleskey*, 481 U.S. at 292, 107 S.Ct. 1756 (quoting *Whitus v. Georgia*, 385 U.S. 545, 550, 87 S.Ct. 643, 17 L.Ed.2d 599 (1967)).

108. *Id.* at 292–93, 107 S.Ct. 1756 ("[T]o prevail under the Equal Protection Clause, [appellant] must prove that the decisionmakers in *his* case acted with discriminatory purpose").

109. *Cf. Ex parte Davis*, 947 S.W.2d 216, 224 (Tex.Crim.App.1996) (holding that Article 11.071 did not interfere with "core judicial functions" but merely regulated when substantive claims could be raised).

110. *See, e.g., Roberts*, 220 S.W.3d at 535.

111. *Luna v. State*, 268 S.W.3d 594, 609–10 (Tex.Crim.App.2008).

112. *Crenshaw*, 378 S.W.3d at 467.

113. *See Colburn*, 966 S.W.2d at 520.

"when it failed to instruct the jury so as to provide a reasoned and rational moral process for the consideration and implementation of mitigating circumstances." Appellant argues that the jury instructions on the special issues, "both in their lack of definition and because of their structure, failed to provide a constitutionally satisfactory process for considering and giving effect to mitigating circumstances." He asserts that the Eighth Amendment requires a greater degree of accuracy and fact-finding in a capital case than in a noncapital case, and the "vague and inherently flawed" jury instructions did not assure this heightened degree of reliability.

Because appellant does not specify which part of the jury instructions on the special issues are "vague and inherently flawed," it is surmised that this point of error is an allegation of cumulative error or harm based on the separate allegations of error specified in points of error six through eighteen. However, in points of error six through eighteen, appellant did not establish that the trial court erred. Therefore, there is no error to cumulate.[114] In the alternative, this point of error is inadequately briefed.[115] Point of error nineteen is overruled.

The judgment of the trial court is affirmed.

Alcala, J., filed a concurring opinion in which Newell, J., joined.

---

**114.** *See Gamboa*, 296 S.W.3d at 585.

**115.** Tex.R.App. P. 38.1 38.1(i); *Ladd v. State*, 3 S.W.3d at 575.

**1.** Because his offense occurred in 1975, appellant's capital-murder conviction is governed by the sentencing scheme set forth in Code of Criminal Procedure Article 37.0711. *See* Tex.Code Crim. Proc. art. 37.0711. That

Alcala, J., filed a concurring opinion in which Newell, J., joined.

## CONCURRING OPINION

Except for points of error three, eleven, and seventeen, I join this Court's majority opinion that affirms the capital-murder conviction and death sentence against Willie Roy Jenkins, appellant. I otherwise concur in this Court's judgment and write separately to address these three points of error.

First, with respect to appellant's third point of error, I agree with the majority opinion's ultimate conclusion that the trial court did not abuse its discretion by excluding appellant's proposed mitigation evidence that would have demonstrated his offer to plead guilty to the offense in exchange for a life sentence without parole. In a hearing outside the jury's presence at the end of appellant's punishment evidence, appellant attempted to introduce evidence of his written offer to plead guilty. Specifically, appellant's proposed evidence would have shown that, prior to his trial, he had offered (1) to plead guilty to the offense of capital murder in exchange for a sentence of life imprisonment, (2) to plead guilty to a felony information to the first-degree-felony offense of burglary of a habitation with intent to commit sexual assault after waiving indictment for that offense and waiving any challenge to the applicable statute of limitations, (3) to make the pleas in separate proceedings so as to permit the imposition of two consecutive life sentences, and (4) to waive his right to seek parole on the offenses.[1] The

---

article provides for either a life sentence with the possibility of parole or a sentence of death for this offense. *Id.* 37.0711, §§ 2, 3(a)(1), (g). In contrast, under the current capital-murder sentencing scheme set forth in Code of Criminal Procedure Article 37.071, defendants whose offenses occurred at a later date have a possibility of either a life sentence without parole or a sentence of death. *See id.* art. 37.071, §§ 1, 2(a), (g).

State objected to appellant's offer of evidence, and the trial court sustained the objection. The jury, therefore, never heard this evidence that would show that appellant attempted to plead guilty to the capital murder of Norris in exchange for a sentence of life without parole.

I agree with this Court's majority opinion that the trial-court judge did not abuse his discretion by disallowing appellant's proposed mitigation evidence. Rule 403 of the Rules of Evidence provides that, although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence. TEX.R. EVID. 403. Under the circumstances of this case, the probative value of the evidence was minimal because appellant's offer to plead guilty was conditional, in that it was only in exchange for him receiving a life sentence that would have taken the death penalty off the table. Appellant could have pleaded guilty to capital murder to the jury without an agreed plea bargain with the State, but, under these circumstances in which his offer to plead guilty was only in exchange for the plea bargain, this evidence was more suggestive of his desire to avoid the death penalty than of an acceptance of responsibility for the offense. With respect to whether the admission of the evidence would have been overly prejudicial in this case, I note that, if I were the trial-court judge, I would not have determined that the evidence was overly prejudicial because the jury could have decided for itself whether appellant's motives for attempting to resolve the case absent a trial were based on genuine remorse or a desire for the benefit of a guaranteed life sentence rather than risking a death sentence. But I acknowledge that this presents a very close call and,

therefore, I defer to the trial court's ruling because I cannot conclude that the judge was outside the bounds of reasonable disagreement in his decision to exclude the evidence. *See Pawlak v. State*, 420 S.W.3d 807, 810 (Tex.Crim.App.2013) (in reviewing a trial court's ruling under Rule of Evidence 403, the ruling "must be upheld if it is within the zone of reasonable disagreement"); *Winegarner v. State*, 235 S.W.3d 787, 791 (Tex.Crim.App.2007) (explaining that Rule 403 "gives the trial court considerable discretion to exclude evidence when it appears to that individual judge, in the context of that particular trial, to be insufficiently probative when measured against the countervailing factors specified in the rule"; Rule 403 "thus allows different trial judges to reach different conclusions in different trials on substantially similar facts without abuse of discretion"). I note, however, that in another case, it may be that a trial court may decide to take the opposite course to admit this type of evidence by determining that it is not overly prejudicial under Rule 403, and it may be that that ruling would too fall within the bounds of the judge's discretion and would not result in reversible error. I note here that at least two federal district courts have concluded that this type of evidence of a defendant's willingness to plead guilty to a capital offense in exchange for a life sentence is relevant in mitigation to show acceptance of responsibility. *See Johnson v. United States*, 860 F.Supp.2d 663, 903–04 (N.D.Iowa 2012) (in capital-murder case, holding that trial counsel "performed deficiently in failing to attempt to introduce [defendant's] offer to plead guilty to a life sentence" because, "[w]here the offer to plead guilty *comes from the defendant* ... it does have some bearing on the defendant's character and, more specifically, on the defendant's acceptance of responsibili-

ty for the charged offense"); *United States v. Fell*, 372 F.Supp.2d 773, 784 (D.Vt.2005) (permitting capital-murder defendant to introduce during the penalty phase a stipulation that he had offered to plead guilty in exchange for a life-without-parole sentence because that offer was "relevant to the mitigating factor of acceptance of responsibility"); *but see Owens v. Guida*, 549 F.3d 399, 420 (6th Cir.2008) (although evidence of defendant's willingness to plead guilty to capital offense might be relevant to the positive character trait of acceptance of responsibility, defendant's offer in that case "show[ed] no such acceptance"; defendant "did not offer to plead guilty unconditionally, which she could have done," and instead she agreed to plead guilty "only if guaranteed a life sentence in return"; thus, she was "less interested in accepting responsibility and more interested in avoiding the electric chair, a motivation that is much less persuasive as a mitigating factor"). The fact that courts have held both ways on this issue lends further support to the idea that such a ruling, whether admitting or excluding the evidence, is generally subject to reasonable disagreement and thus will not constitute an abuse of discretion in the ordinary case.

Because I agree that the trial court's ruling excluding the evidence of appellant's willingness to plead guilty in exchange for a life sentence was not an abuse of discretion, I agree with the Court's decision to overrule appellant's third issue.

Second, with respect to appellant's eleventh point of error, I would, at this juncture, assume that the trial court erred by failing to define the phrase "continuing threat to society," but I would find the error harmless based on the egregious facts in this case. Appellant contends that the trial court committed constitutional error under the Eighth and Fourteenth amendments by failing to define that phrase as being limited to "a threat of serious bodily injury or death, whether in or out of prison, and continuing after parole eligibility," but under this Court's precedent, that complaint has never been sustained. In the past, I have joined at least one opinion upholding that precedent. But, having considered similar complaints over many years, it appears to me that it may be necessary for this Court to reconsider that precedent in order to ensure that the death-penalty statutes in Texas are constitutional, in the sense that they limit the applicability of the penalty to only the worst of the worst offenders. *See Roper v. Simmons*, 543 U.S. 551, 568, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005) (explaining that "[c]apital punishment must be limited to those offenders who commit 'a narrow category of the most serious crimes' and whose extreme culpability makes them 'the most deserving of execution'"; accordingly, states "must give narrow and precise definition to the aggravating factors that can result in a capital sentence") (quoting *Atkins v. Virginia*, 536 U.S. 304, 319, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002)). To narrow the term, a trial court could define the word "society" as including only the people with whom a person convicted of capital murder may reasonably be expected to be in contact with for the remainder of his life. That type of instruction would likely lead a jury to consider whether a convicted capital murderer would be a continuing threat in prison society or in the free world only if the jury reasonably considered him to be a prison escape risk. Here, however, even assuming that the trial court erred by failing to define the term, appellant was not likely harmed based on the egregious facts in this case.

The record in this case shows that, in 1975, appellant sexually assaulted and killed Sheryl Norris in a random and vio-

lent crime. The crime was unsolved until 2010, when appellant's DNA profile in the Combined DNA Index System, or CODIS, was matched to the rape-kit DNA sample that had been collected from Norris after her death. Appellant's DNA was in CODIS because of his sexual-assault convictions against several other women. By the time of his 2013 trial for this case, appellant had been convicted of rape four times between 1977 and 1991 in California and Texas, and he had received sentences ranging from three years' probation to ten years in prison. In the twenty-two years prior to his trial for the instant offense, appellant had been continually confined in California or Texas either in prison or in an institution pursuant to a civil commitment as a sexually violent predator. The State's case in the punishment phase of trial included, among other evidence, testimony from another one of appellant's victims who described how he randomly abducted and sexually assaulted her, and she had explained how the event had negatively impacted almost every facet of her life. The punishment evidence also included a lengthy history of appellant's violence while confined for his multiple offenses. Given the extensive evidence of appellant's future danger to society both in the free world and in prison society, I conclude that any error in failing to define the term "continuing threat to society" was harmless.

Third, I would assume error with respect to appellant's point of error seventeen, but, for reasons similar to those expressed above, I would find the error harmless. In point of error seventeen, appellant contends that the trial court erred by denying a defense motion to preclude the death penalty as a sentencing option due to Equal Protection violations. Appellant complains about the absence of statewide standards to guide Texas prosecutors in deciding when they should seek the death penalty. Appellant suggests that, as a prerequisite to implementing death-penalty systems, states must establish mechanisms to ensure that the lives of all of their citizens are treated equally. Without such uniform and specific standards in place, appellant contends that Texas's system permits the arbitrary and disparate treatment of similarly situated people in violation of the Equal Protection Clause of the Fourteenth Amendment. Appellant cites to *Bush v. Gore*, 531 U.S. 98, 106, 121 S.Ct. 525, 148 L.Ed.2d 388 (2000), as support for his argument that Texas "lack[s] [ ] standards to ensure nonarbitrary treatment with regard to the right to life;" given that the right to life is fundamental, he asserts that "a state may not, by arbitrary and disparate treatment, value one person's life over that of another." Appellant argues that he is challenging "a system in which unchecked official discretion makes arbitrary and unequal treatment inevitable." Appellant contends that prosecutors in each of Texas's 254 counties make decisions on whether to seek the death penalty according to unwritten and wildly varying standards. He argues that the decision whether "a person charged with a capital crime will face the death penalty depends on arbitrary factors such as the location where the crime took place and, even more disturbingly, the race of the accused and the victim." Appellant believes that "statewide standards would remedy this violation of the Equal Protection Clause."

Many of appellant's arguments are intellectually appealing, but this is not the appropriate case in which to address these matters because appellant cannot show that he was harmed by the absence of statewide standards that would guide the prosecution's decision whether to seek the death penalty in a particular case. Because of appellant's lengthy history of sex-

ual assaults and other violence while in and out of confinement, it is nearly certain that any such statewide standards would include him within the category of offenders who may be properly subjected to the death penalty.

With these comments, I respectfully concur in this Court's judgment.