

# COURT OF APPEALS
### SECOND DISTRICT OF TEXAS
### FORT WORTH

## NO. 02-17-00174-CR

REBECCA PLUMLEE                                 APPELLANT

V.

THE STATE OF TEXAS                                     STATE

----------

### FROM THE 97TH DISTRICT COURT OF MONTAGUE COUNTY
### TRIAL COURT NO. 2016-0197M-CR

----------

## MEMORANDUM OPINION[1]

----------

## I. Introduction

A jury found Appellant Rebecca Plumlee guilty of possession of a controlled substance (methamphetamine) in an amount of 1 gram or more but less than 4 grams, and the trial court assessed her punishment at 30 years' confinement after finding the indictment's enhancement allegations true. *See*

---

[1]*See* Tex. R. App. P. 47.4.

Tex. Health & Safety Code Ann. § 481.115(a), (c) (West 2017); Tex. Penal Code Ann. § 12.42 (West Supp. 2017) (setting out punishment range for offense enhanced by repeat felonies). In two issues, Plumlee appeals, complaining that the evidence is insufficient to support her conviction. We affirm.

## II. Standard of Review

In our due-process review of the sufficiency of the evidence to support a conviction, we view all of the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); *Jenkins v. State*, 493 S.W.3d 583, 599 (Tex. Crim. App. 2016). This standard gives full play to the responsibility of the trier of fact to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Jenkins*, 493 S.W.3d at 599.

The trier of fact is the sole judge of the weight and credibility of the evidence. *See* Tex. Code Crim. Proc. Ann. art. 38.04 (West 1979); *Blea v. State*, 483 S.W.3d 29, 33 (Tex. Crim. App. 2016). Thus, when performing an evidentiary sufficiency review, we may not re-evaluate the weight and credibility of the evidence and substitute our judgment for that of the factfinder. *See Montgomery v. State*, 369 S.W.3d 188, 192 (Tex. Crim. App. 2012). Instead, we determine whether the necessary inferences are reasonable based upon the cumulative force of the evidence when viewed in the light most favorable to the

2

verdict. *Murray v. State*, 457 S.W.3d 446, 448 (Tex. Crim. App.), *cert. denied*, 136 S. Ct. 198 (2015). We must presume that the factfinder resolved any conflicting inferences in favor of the verdict and defer to that resolution. *Id.* at 448–49; *see Blea*, 483 S.W.3d at 33.

To determine whether the State has met its burden under *Jackson* to prove a defendant's guilt beyond a reasonable doubt, we compare the elements of the crime as defined by the hypothetically correct jury charge to the evidence adduced at trial. *See Jenkins*, 493 S.W.3d at 599; *Crabtree v. State*, 389 S.W.3d 820, 824 (Tex. Crim. App. 2012) ("The essential elements of the crime are determined by state law."). Such a charge is one that accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried. *Jenkins*, 493 S.W.3d at 599. The law as authorized by the indictment means the statutory elements of the charged offense as modified by the factual details and legal theories contained in the charging instrument. *See id.*; *see also Rabb v. State*, 434 S.W.3d 613, 616 (Tex. Crim. App. 2014) ("When the State pleads a specific element of a penal offense that has statutory alternatives for that element, the sufficiency of the evidence will be measured by the element that was actually pleaded, and not [by] any alternative statutory elements.").

### III. Sufficiency

Plumlee argues that the evidence was insufficient to show that she knowingly possessed the controlled substance, i.e., that she knew methamphetamine was in her purse, and that it was "never established on the record that methamphetamine was a penalty group 1 drug at the time [she] was arrested."

### A. Evidence

#### 1. State's Case

Mark Breeding, an Enterprise truck driver, testified that on July 8, 2014, he arrived at Enterprise's truck yard at around 3:30 a.m. to conduct his pre-trip maintenance inspection. When he unlocked the gate to the truck yard, he saw three people walking down Skinner Road, which bordered the truck yard.[2]

Breeding proceeded through the gate, parked his pickup truck facing the eighteen-wheeler, and left his pickup running to provide light while he checked the eighteen-wheeler's oil and fluids.[3] He left open the doors to his pickup so he could unload his belongings and started the eighteen-wheeler's engine. When he walked back around to the pickup to retrieve his briefcase, he was startled by

---

[2]Breeding said he did not think anything of seeing the people walking down Skinner Road "because you see it all of the time at that time of morning in Bowie."

[3]Breeding said that because there had been problems with the yard's lights, his pickup's headlights provided the only illumination in the predawn hours.

the sudden appearance of three people standing by the driver's side of his pickup. He identified Plumlee as one of these people.[4]

Breeding said that Plumlee was wearing only a bra and panties. One of the men was wearing shorts and no shoes. In their five-to-ten-minute encounter—during which time Breeding tried to get rid of the trio because they were not appropriately dressed to be on the worksite[5]—the other man removed his button-down shirt and gave it to Plumlee to wear.

The trio first asked Breeding to give them some water. He declined to open the office to do so and did not have sufficient water available in his truck to give to them. They then asked Breeding to let them borrow his pickup "to go get water." As the trio walked around the yard and circled Breeding, he noticed that one of the men had a big Bowie knife on him.[6] Breeding said that he was very nervous and a little bit scared because he was the only one there "and you could tell there was something wrong . . . . [T]hey were on something . . . ."

A few minutes later, one of the men with Plumlee told Breeding that they were going to take his pickup. Breeding refused, grabbed his pistol out of the

---

[4]A subsequent witness identified the two males as "McGowan" and "Geesland."

[5]Breeding stated that the company hauled oil that contained gases "and a numerous amount of other nasty things," requiring the company's employees to wear H2S monitors and benzene monitors to prevent poisoning from the hydrocarbons.

[6]A subsequent witness identified McGowan as the man with the knife.

truck, and put it in his pocket. Breeding said that all three had bloodshot eyes and while one of them was quiet, the other two were "just rattling nonstop" but what they said made no sense.[7] Breeding was relieved when another employee came in early, saw that Breeding was surrounded, and told the group that they needed to leave. Breeding said that when his coworker told them to leave, "they commenced to giving him the same grief that they were giving [Breeding]." His coworker also noticed the big knife and called 9-1-1. When the trio realized that 9-1-1 had been called, Plumlee sat down while McGowan and Geesland started to leave.

Approximately five minutes after his coworker called 9-1-1—which Breeding described as "an eternity"—a Bowie police officer arrived "and the sheriff was right behind him," which Breeding said helped to defuse the situation. Breeding said that when the deputy arrived, Plumlee sat down in the rocks beside Breeding's pickup, opining, "I guess she knew that -- to give up or whatever. I don't know."[8]

Former Deputy Sheriff Cody Stone[9] testified that he was on duty, working for Montague County, during the early morning hours of July 8, 2014, and that he

---

[7]Breeding did not identify which of the three was the quiet one. When asked by the prosecutor whether Plumlee was acting "a little out of sorts," Breeding replied, "Yes, ma'am."

[8]Plumlee did not cross-examine Breeding.

[9]By the time of trial, he was employed as a police officer for the Bowie Police Department.

6

was dispatched to the Enterprise yard at around 3:45 a.m. Because he was in the northern part of the county when the call came in, he asked other units to go to the location to secure the scene. Two marked Bowie Police Department patrol units arrived at the yard before he did.

Officer Stone said that when he arrived at the yard, Plumlee was sitting cross-legged on the ground next to a pickup with her purse on her lap. Geesland was walking around and acting nervously, while McGowan was not moving around much. One of the other officers advised him that a large knife had been removed from McGowan.

Officer Stone testified that because he did not know if Plumlee or her companions possessed any other weapons, he was concerned about his safety. So after identifying the trio to the dispatcher, he asked them for consent to search their persons. The men acquiesced, and he patted them down, finding no weapons. Officer Stone then asked Plumlee for permission to search her. She responded to his request by handing her purse to him.

Officer Stone took Plumlee's purse to the hood of his patrol vehicle. Plumlee followed him and stood close to him the entire time while he searched. During this time, Plumlee voiced no objections. When Officer Stone pulled back a zipper pocket to check for weapons, he saw a little plastic baggie of the type commonly used to hold methamphetamine. When he pulled out the baggie, he saw "a white crystal-like substance" in it. A further search revealed a folded-up cough drop wrapper containing what he thought were more narcotics.

7

Officer Stone said that when he removed the baggie from Plumlee's purse, Plumlee declared, "[T]hat's not mine, there's no way that's mine."[10] Nevertheless, based on his discoveries, Officer Stone arrested Plumlee "for possession of a controlled substance, PG 1." He explained that "PG 1" meant penalty group 1, one of the penalty groups under the health and safety code used to categorize various drugs, but that this was only a preliminary charge until the drugs were actually weighed.

Officer Stone transported Plumlee and McGowan to the jail. Officer Stone was present when Plumlee's book-in photo was taken. The trial court admitted the photo into evidence. Officer Stone noted that the book-in photo shows that the pupils of Plumlee's eyes were dilated, which he stated was a sign that she had used methamphetamine. However, he also conceded on cross-examination that there are a number of substances that can cause a person's pupils to dilate and that a person's pupils also dilate in the dark.

William Todsen, a forensic scientist with the Texas Department of Public Safety Crime Laboratory in Abilene, tested the two items found in Plumlee's purse, both of which contained methamphetamine, the total amount of which weighed 1.57 grams. He also testified that methamphetamine is a controlled substance in Penalty Group 1.

---

[10]Officer Stone stated that this occasion was not the first time he had been given consent to search and found illegal contraband.

## 2. Defense's Case

Plumlee opted to testify in her own defense. At some point before the events leading to her July 8, 2014 arrest, her father had died, and Plumlee had intended to go to her stepmother's house in Montague County to retrieve her father's truck and take it home with her "to get it legal and get the paperwork changed and all of that." A female friend from a nearby town gave Plumlee a ride to Bowie on the night in question to a party at a house "by the sale barn," where several people were drinking and some people were doing drugs. Plumlee said that she drank but did not use any drugs and that she had planned to go to her stepmother's house the next day. Plumlee's friend left the party and went home before the homeowner kicked everyone out.

Plumlee said that after the homeowner abruptly told everyone to leave, she went outside before realizing that she had left her purse in the house. Plumlee described the situation as "a lot of motion and a lot of yelling . . . . [I]t was just kind of crazy there for a minute." She asked the homeowner if she could retrieve her bag; he said no, but someone else went in and got it for her after she described where her purse was located.[11]

Upon leaving the house, Plumlee headed for her stepmother's house. McGowan and Geesland, both of whom she had met for the first time at the

---

[11]Plumlee denied that she had been in her underwear that night, stating that she was wearing a swimsuit and a pair of shorts. During cross-examination, Plumlee said that her clothes were in a bag that had not been retrieved from the house.

9

party, were from the area and offered to accompany her. They walked down the street, took a right, then took another right, and ultimately ended up in Enterprise's yard. Because Plumlee did not know her way around, McGowan was using Plumlee's phone to navigate, and she followed him. Plumlee testified that she did not recall anything being said to Breeding about his truck, and she denied having asked him for water.

Plumlee agreed that from the point that the police arrived, the events that occurred were "[p]retty close to what they said." She agreed that methamphetamine was found in her purse but stated that she had not known that it was in there and denied that the methamphetamine belonged to her. Plumlee did not dispute that methamphetamine was a controlled substance or that the quantity found in her purse was 1.57 grams.

Plumlee acknowledged that she had prior criminal convictions: Plumlee was arrested in 2013 for failure to identify; in 2009, she had pleaded guilty to fraud in exchange for five years' confinement; in 2005, she had pleaded guilty to fraudulent possession of a controlled substance or prescription—hydrocodone—in exchange for two years' confinement; and in 2003, she had pleaded guilty to the felony offense of attempting to obtain a controlled substance by fraud in exchange for probation, which was subsequently revoked. At the time she was arrested for the possession-of-a-controlled-substance offense at issue, she was unemployed.

**B. Analysis**

In her first issue, Plumlee argues that there is no evidence that methamphetamine was a Penalty Group 1 substance at the time of her arrest in 2014.[12] In her second issue, she challenges the sufficiency of the evidence to show that she knew the methamphetamine was in her purse.

In her first issue, Plumlee concedes that the State's witnesses explained that she had been arrested for possession of methamphetamine, a Penalty Group 1 controlled substance, but she nonetheless argues that the testimony was "entirely in the present tense." That is, Plumlee contends that no evidence was presented to allow the jury to reasonably infer that methamphetamine was a controlled substance in Penalty Group 1 at the time of her *arrest* rather than at the time of her *trial*.

Whether methamphetamine was a controlled substance in Penalty Group 1 is a question of law, not of fact. *See Lindsay v. State*, No. 06-11-00242-CR, 2012 WL 3132729, at *2 (Tex. App.—Texarkana July 31, 2012, no pet.)

---

[12]The State argues that it did not have to prove methamphetamine's penalty group in part because it never alleged in the indictment that methamphetamine was in Penalty Group 1 and that in any event, Plumlee never objected to the indictment. We do not read Plumlee's argument as complaining about a lack of notice in the indictment, *cf. Hicks v. State*, 419 S.W.3d 555, 558 (Tex. App.—Amarillo 2013, pet. ref'd) ("For over a century, it has been clear that '[e]very one is conclusively presumed to know the law, both as to civil and criminal transactions.'" (quoting *Thompson v. State*, 26 Tex. Ct. App. 94, 97–98, 9 S.W. 486, 486 (1888))), but we do note that the indictment's header listed the charge as "POSS CS PG 1 >=1G<4G—481.115(c) HSC," an abbreviation for health and safety code section 481.115, "Offense: Possession of Substance in Penalty Group 1," subsection (c).

(mem. op., not designated for publication). And, as pointed out by the State, the trial court, not the State, had the obligation to charge the jury on the law in effect at the time of the offense. *See* Tex. Code Crim. Proc. Ann. art. 36.14 (West 2007) (requiring jury charge to set forth the law applicable to the case); *Mendez v. State*, 545 S.W.3d 548, 552 (Tex. Crim. App. 2018) (stating that the trial court's charge should include "at a minimum, 'all of the law applicable to the criminal offense that is set out in the indictment or information,' as well as 'general admonishments, including . . . the presumption of innocence, proof beyond a reasonable doubt, unanimity of the verdict, and so forth" (quoting *Delgado v. State*, 235 S.W.3d 244, 249 (Tex. Crim. App. 2007))).

In its charge, the trial court informed the jury that methamphetamine was a controlled substance under Texas law, and Plumlee has not raised a complaint about the jury charge in this appeal. We overrule Plumlee's first issue.

In her second issue, Plumlee challenges the sufficiency of the evidence to show that she knew the methamphetamine was in her purse because she (1) denied that the drugs were hers at the time of their discovery, (2) never tried to hide her purse from the police, (3) handed her purse to Officer Stone without incident, (4) lost control over the purse at some point before the drugs were found, and (5) testified that the drugs were not hers.

12

A person commits the offense of possession of a controlled substance if she knowingly[13] or intentionally possesses a controlled substance listed in Penalty Group 1. Tex. Health & Safety Code Ann. § 481.102(6) (West Supp. 2017), § 481.115(a). To prove possession, the State must prove that the accused (1) exercised actual care, custody, control, or management over the substance and (2) knew that the matter possessed was a controlled substance. *Id.* § 481.002(38) (West 2017); *Evans v. State*, 202 S.W.3d 158, 161 (Tex. Crim. App. 2006). The State may prove the elements of possession through direct or circumstantial evidence; however, the evidence must establish that the accused's connection with the substance was more than fortuitous. *Poindexter v. State,* 153 S.W.3d 402, 405–06 (Tex. Crim. App. 2005), *overruled in part on other grounds by Robinson v. State*, 466 S.W.3d 166, 173 & n.32 (Tex. Crim. App. 2015). When the contraband is not in the defendant's exclusive possession, a factfinder may nonetheless infer that the defendant intentionally or knowingly possessed it if there are sufficient independent facts and circumstances justifying such an inference, including—but not limited to—the defendant's proximity to and accessibility of the controlled substance, whether she was under the influence of a controlled substance when arrested, and whether she owned or had the right to

---

[13]A person acts "knowingly" (1) with respect to the nature of his conduct or to circumstances surrounding his conduct when he is aware of the nature of his conduct or that the circumstances exist and (2) with respect to the result of his conduct when he is aware that his conduct is reasonably certain to cause the result. Tex. Penal Code Ann. § 6.03(b) (West 2011).

possess the place where the drugs were found. *See id.* at 406; *see also Evans*, 202 S.W.3d at 162 n.12.

Here, Breeding testified that Plumlee appeared at his industrial worksite at around 3:30 a.m. scantily attired and accompanied by two men, one of whom was shoeless. She and her companions asked odd questions, had bloodshot eyes, and appeared to be "on something." Officer Stone found the drugs in Plumlee's purse and noticed that the pupils of Plumlee's eyes were dilated, which he took as a sign that she had used methamphetamine. He also testified that it was not unusual for people to give consent to a search resulting in the discovery of illegal contraband.

Plumlee, who had multiple prior convictions involving controlled substances and fraud, testified that she had lost possession of her purse earlier that evening and that the methamphetamine found therein was not hers. However, as the exclusive judge of the credibility of the witnesses, the jury was entitled to believe all, some, or none of her testimony. *See Franklin v. State*, 193 S.W.3d 616, 620 (Tex. App.—Fort Worth 2006, no pet.) ("[T]he jury is free to accept or reject any or all of the evidence of either party, and any or all of the testimony of any witness."). Viewed in the light most favorable to the verdict, then, the jury could have instead chosen to believe Breeding's testimony about Plumlee's unusual behavior in the pre-dawn hours and Officer Stone's testimony about her dilated eyes and finding the drugs in her purse to draw the reasonable

inference that Plumlee knowingly possessed the drugs in her purse.  Accordingly, we overrule Plumlee's second issue.

## IV.  Conclusion

Having overruled both of Plumlee's issues, we affirm the trial court's judgment.

/s/ Bonnie Sudderth

BONNIE SUDDERTH
CHIEF JUSTICE

PANEL:  SUDDERTH, C.J.; PITTMAN and BIRDWELL, JJ.

DO NOT PUBLISH
Tex. R. App. P. 47.2(b)

DELIVERED:  June 28, 2018

15