

# COURT OF APPEALS
### SECOND DISTRICT OF TEXAS
### FORT WORTH

## NO. 02-17-00010-CR

ANTHONY CHRISTOPHER
MERITO

APPELLANT

V.

THE STATE OF TEXAS

STATE

----------

### FROM COUNTY COURT AT LAW NO. 2 OF WICHITA COUNTY
### TRIAL COURT NO. 67354-F

----------

## MEMORANDUM OPINION[1]

----------

Appellant Anthony Christopher Merito raises one issue challenging the sufficiency of the evidence supporting his conviction for violating a court order enjoining organized criminal activity. Specifically, Merito asserts that there is no evidence showing that he knowingly violated an agreed injunction by driving through a gang-activity "safe zone" and thus there is no evidence that he

---

[1]*See* Tex. R. App. P. 47.4.

knowingly committed the offense of violating an order enjoining organized criminal activity. We affirm.

## BACKGROUND

On or about June 27, 2008, the City of Wichita Falls, Texas filed a petition for a permanent injunction against the "Puro Lil' Mafia" gang (PLM) to dissolve the relationships between members of the PLM and thereby prevent criminal activity. The petition contained a written description of what the State called, "PLM Safety Zone #1." The PLM Safety Zone #1 represented an area in which individuals named in the petition would be prohibited from engaging in certain activities described therein. Attached to the petition as exhibit "A" was a map that purported to be "[a] true and correct representation of the above-described boundaries." Merito was named in the petition as a defendant-member of PLM. Although at the time the petition was filed, Merito was incarcerated in the Lindsey State Jail, Merito does not dispute that he was served with the petition, which included the map of the PLM Safety Zone #1 as an attachment.

On or about August 5, 2008, while still incarcerated, Merito signed an agreed permanent[2] injunction (agreed injunction), which provided in relevant part that Merito was permanently restrained and enjoined from using the PLM Safety Zone #1 to engage in a litany of activities. The agreed injunction described the boundaries of the PLM Safety Zone #1 as follows:

---

[2]Although styled as "permanent," the agreed injunction provided that the injunction would expire on August 4, 2015.

2

Beginning at the intersection of the 2900 block of Wenonah Avenue and the 3300 block of Kell Boulevard, continuing north along the west side of Wenonah Avenue to the intersection of the 1900 block of Wenonah Avenue and the 1000 block of West Wenonah Boulevard, continuing west on the south side of West Wenonah Boulevard, then continuing north on the west side of West Wenonah Boulevard, then continuing east on the north side of West Wenonah Boulevard, then continuing north on the west side of West Wenonah Boulevard to the intersection of the 900 block of West Wenonah Boulevard and the 3300 block of 9th Street,

Thence continuing east on the north side of 9th Street to the intersection of the 3200 block of 9th Street and the 500 block of Beverly Drive, continuing northwest and then north and then northeast on the west side of Beverly Drive to the intersection of the 500 block Beverly Drive and the 3100 block of 5th Street (Seymour Highway), continuing northeast and then east on the northside of 5th Street (Seymour Highway) to the intersection of the 1400 block of 5th Street and the 500 block of Broad Street,

Thence continuing northwest on the east side of the 500 block of Broad to Central Expressway, continuing northwest and then north and then northwest on the west side of Central Freeway to the 900 block of Central Freeway where it crosses the 1600 block of Old Iowa Park Road;

Thence at the north side of the 1600 block of Old Iowa Park Road where it crosses Central Freeway, continuing southeast on the east side of Old Iowa Park Road to the intersection of the 1400 block of Old Iowa Park Road and the 1400 block of North Scott Avenue, continuing southeast on the east side of North Scott Avenue to the intersection of the 100 block of East Scott Avenue and the 800 block of East Kell Boulevard, continuing southeast on the east side of East Scott Avenue and then Scott Avenue and then east and then northeast on the north side of East Scott Avenue to the intersection of the 200 block of East Scott Avenue and the 1900 block of East Fort Worth Street, continuing southeast on the east side of E. Fort Worth Street to the intersection of the 1400 block of E. Fort Worth Street and the 1500 block of McKinney Road;

Thence to the east side of 1500 block of McKinney Road, continuing southeast and then south and then southeast and then east and then south on the east side of McKinney Road to the intersection of

the 2700 block of McKinney Road and the 2300 block of Central Freeway East;

Thence then from the south side of the 2300 block of Central Freeway East, continuing west on the south side of Central Freeway East to the Henry S. Grace Freeway, continuing west and then southwest on the east side of the 3800 block of the Henry S. Grace Freeway to the 900 block of Midwestern Parkway,

Thence west and then northwest and then west on the south side of the 1500 block of Midwestern Parkway to the 3600 block of Old Jacksboro Highway, continuing north on the west side of the 3200 block of Old Jacksboro Highway to the 3200 block of Holliday Road, continuing north on the west side of the 2700 block of Holliday Road to the 1500 block of Speedway Avenue, continuing west on the south side of the 1700 block of Speedway Avenue to the 2500 block of Brook Avenue, continuing north on the west side of the 2200 block of Brook Avenue to the 1700 block of Kell Boulevard, continuing southwest on the south side of Kell Boulevard to end at the intersection of the 3300 block of Kell Boulevard and the 2900 block of Wenonah Boulevard. The boundaries of the "PLM Safety Zone #1" include and incorporate an area fifty (50) feet from the furthermost curb line of the boundary.

Following the description of the PLM Safety Zone #1, the agreed injunction stated that "[a] true and correct representation of the above-described boundaries of PLM SAFETY ZONE #1 is attached to this Agreed Order as 'PLM Safety Zone 1.'" Finally, the agreed injunction provided that by signing, Merito agreed "that the PLM Safety Zone #1 is a reasonable and understandable geographic area for this injunction."

On April 17, 2015—nearly seven years after the trial court entered the agreed injunction—several of Wichita Falls's Gang Task Force officers were eating at a local grocery store when they saw Merito enter the building with a small child. The officers observed that Merito was wearing black and grey, the

4

colors of PLM. Although the grocery store is not in the PLM Safety Zone #1 and one of the officers acknowledged that Merito did not appear to be engaging in any criminal activity, the officers waited in the parking lot in an unmarked vehicle and began following Merito as he left the parking lot. Upon leaving the restaurant, the officers observed Merito's vehicle traveling through the PLM Safety Zone #1. Merito concedes that during this drive he "possibly clipped the 50 foot 'buffer' of the injunction zone." As the officers followed and surveilled Merito driving through the PLM Safety Zone #1, they observed that his license plate was obstructed and that he failed to utilize his turn signal when changing lanes. Eventually, Merito was pulled over, and the officers discovered that his vehicle was not registered.

On August 14, 2015, an information was filed in Wichita County alleging that Merito violated the agreed injunction, and thus section 71.021 of the penal code, by operating a motor vehicle without a license plate or with an obstructed view or by wearing clothes which Merito knew identified membership with a criminal street gang within the PLM Safety Zone #1. The information was later amended to include the allegation that Merito also violated the agreed injunction by operating a motor vehicle that has not been registered and without financial responsibility established for the vehicle.

In October 2016, Merito's case was tried to a jury. At trial, the State called the deputy district clerk to testify concerning a certified copy of the agreed injunction, which was labeled as State's Exhibit "3." When Merito's counsel

5

questioned the clerk on voir dire, the clerk confirmed that the map was not attached as part of the district clerk's file.  Upon pointed questioning by the trial court, the Prosecutor conceded that no map was attached to the agreed injunction that was filed or served on Merito:

> THE COURT:  Are you saying that the document that was filed did not have the map?
>
> [PROSECUTOR]:  Yes, your Honor.
>
> THE COURT:  And that's the one that was served upon the defendant?
>
> [PROSECUTOR]:  Yes, your Honor.
>
> THE COURT:  Okay, but clearly Judge Brotherton's order make[s] reference to a map?
>
> [PROSECUTOR]:  Yes.
>
> THE COURT:  Okay, but you're still tendering it into evidence?
>
> [PROSECUTOR]:  I'm tendering it into evidence, and just because it's missing that map, it does not make it invalid just because a map is missing.

Over an objection from Merito's counsel, the trial court admitted the State's Exhibit "3" into evidence.

After the State rested, Merito moved for a directed verdict on the specific ground that the State had failed to introduce any evidence that the map was attached to the agreed injunction.  Merito's counsel argued that

> the order that established the gang injunction makes reference to a map of the gang safety zone.  However, the order that was actuall[]y entered which is here as Exhibit 3, is an order that does not have the map attached; therefore, the notice in regard to the safety -- the

6

gang safety zone is inadequate as a matter of law actually; and for these reasons, we move for a directed verdict of a[c]quittal.

The trial court denied the motion, and the jury returned a guilty verdict. The trial court assessed punishment at 120 days in the county jail, but suspended the sentence and placed Merito on one year of community supervision.

Merito timely perfected this appeal.

## DISCUSSION

In his sole issue, Merito challenges the sufficiency of the evidence regarding the "knowingly" element of the offense of violating an organized-criminal-activity injunction.

### A. Standard of Review and Applicable Law

In our due-process review of the sufficiency of the evidence to support a conviction, we view all of the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); *Jenkins v. State*, 493 S.W.3d 583, 599 (Tex. Crim. App. 2016).

The trier of fact is the sole judge of the weight and credibility of the evidence. *See* Tex. Code Crim. Proc. Ann. art. 38.04 (West 1979); *Blea v. State*, 483 S.W.3d 29, 33 (Tex. Crim. App. 2016). Thus, when performing an evidentiary sufficiency review, we may not re-evaluate the weight and credibility of the evidence and substitute our judgment for that of the factfinder. *See*

*Montgomery v. State*, 369 S.W.3d 188, 192 (Tex. Crim. App. 2012). Instead, we determine whether the necessary inferences are reasonable based upon the cumulative force of the evidence when viewed in the light most favorable to the verdict. *Murray v. State*, 457 S.W.3d 446, 448 (Tex. Crim. App.), *cert. denied*, 136 S. Ct. 198 (2015). We must presume that the factfinder resolved any conflicting inferences in favor of the verdict and defer to that resolution. *Id.* at 448–49; *see Blea*, 483 S.W.3d at 33.

For a person to commit a crime for violating a court order enjoining organized criminal activity, a person must (1) knowingly, (2) violate a temporary or permanent order, (3) issued under section 125.065 of the civil practice and remedies code. Tex. Pen. Code Ann. § 71.021(a) (West 2011). Thus, "to violate section 71.021, a person must violate a temporary or permanent injunction with the requisite intent (i.e., knowingly)." *Goyzueta v. State*, 266 S.W.3d 126, 132 (Tex. App.—Fort Worth 2008, no pet.).

## B. Merito was Not Provided with a Copy of the Map of PLM Safety Zone #1 with the Agreed Injunction

Merito first challenges that there is no evidence to establish that he acted knowingly because the map of PLM Safety Zone #1 was not served on him. The State disagrees and sets forth trial exhibit "9" as demonstrating that Merito was initially served with the map in the lawsuit. Merito concedes in his reply brief that he was served with a map of the proposed PLM Safety Zone #1 as it was attached to the original petition, but he nevertheless contends that the map is

8

unenforceable because it was not served on him with the agreed injunction. The State rejoins that Merito has improperly raised a new argument in a reply brief, and, in fact, is an argument that he has never-before raised.

We cannot agree with the State that Merito is improperly raising a new argument in a reply brief. Not only did Merito sufficiently brief the issue in his opening brief, but he raised the specific issue at trial and timely objected to the State's attempt to introduce the agreed order. Indeed, after questioning the State's witness concerning the missing map on voir dire, the State's witness and Prosecutor both conceded that the map was not attached to the agreed injunction. And, after the State rested, Merito moved for a directed verdict on the specific ground that the State had failed to introduce any evidence that the map was attached to the agreed injunction.

Because we agree with Merito that there is no evidence to demonstrate that he was provided a copy of the map with the agreed injunction, we consider if there is any other evidence to support the jury's verdict that Merito knowingly violated section 71.021.

## C.  Merito is Bound by His Agreement to Abide by the Agreed Injunction

Merito asserts that the portion of the agreed injunction that describes the boundaries of the PLM Safety Zone #1 is ambiguous because "[t]he boundaries of the 'PLM Safety Zone #1' include and incorporate an area fifty (50) feet from the furthermost curb line of the boundary." Merito continues, "The [agreed injunction] does not state which direction the 50 feet should extend" or "define

9

what a 'curb line' is, or even to which 'curb' it is referring." The State responds that Merito cannot now complain that the PLM Safety Zone #1 is ambiguous because he agreed in the injunction order that the "PLM Safety Zone #1 is a reasonable and understandable geographic area[.]"

The court is somewhat bothered that Merito was not provided with the map of PLM Safety Zone #1 with the agreed injunction. However, in the context of a section 71.021 violation, this court has rejected a similarly-situated defendant's argument that the injunction was impermissibly vague when the defendant had "voluntarily agreed to the permanent injunction." *Goyzueta*, 266 S.W.3d at 133. And, Merito does not direct the court to anywhere in the record to show that he was coerced or intimidated into signing the agreed injunction. *Cf. Barras v. State*, 902 S.W.2d 178, 181 (Tex. App.—El Paso 1995, pet. ref'd) (holding appellant knowingly waived right to counsel when "[t]here is no evidence in the record to the contrary, nor is there any evidence that Appellant was coerced or intimidated in any way into signing the written waivers"). As a result, Merito is bound by his prior, voluntary agreement that "PLM Safety Zone #1 is a reasonable and understandable geographic area." *See Goyzueta*, 266 S.W.3d at 133.

Further, we are mindful that the jury was apprised of the absence of the map when Merito's counsel questioned the deputy district clerk on voir dire. As the factfinder, the jury was free to weigh the lack of evidence of the map against the following undisputed evidence: the agreed injunction contained a written

10

description of the boundaries of the PLM Safety Zone #1; Merito agreed to and signed the injunction and affirmed that the geographic restriction was "reasonable and understandable"; and Merito had received the map when he was initially served with the petition. *See Blea*, 483 S.W.3d at 33*.* Deferring, as we must, to the factfinder on the weight of the evidence, we hold that a rational trier of fact could have concluded that Merito knowingly violated 71.021 in the manner alleged, even though the agreed injunction did not include a map of the PLM Safety Zone #1. *See id.* (citing *Dobbs v. State*, 434 S.W.3d 166, 170 (Tex. Crim. App. 2014)).

Accordingly, we overrule Merito's sole issue.

## CONCLUSION

Having overruled Merito's sole issue, we affirm the final judgment.

/s/ Mark T. Pittman
MARK T. PITTMAN
JUSTICE

PANEL:  WALKER, KERR, and PITTMAN, JJ.

DO NOT PUBLISH
Tex. R. App. P. 47.2(b)

DELIVERED:  June 28, 2018